UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SIZZLING BLACK ROCK STEAK
HOUSE FRANCHISING, INC., a
Michigan corporation,                                    Case No. 21-cv-11621

                            Plaintiff,                   Paul D. Borman
                                                         United States District Judge
v.

HAROLD L. KESTENBAUM, PC, a
New York professional corporation,
HAROLD L. KESTENBAUM, an
individual, and SPADEA LIGNANA,
LLC, a Pennsylvania professional limited
liability company,

                            Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2) (ECF NO. 6)

Plaintiff Sizzling Black Rock Steak House Franchising, Inc. retained Defendants Harold Kestenbaum, Harold L. Kestenbaum P.C., and Spadea Lignana, LLC as its legal counsel for all franchise matters. Harold Kestenbaum is a resident of New York, Harold L. Kestenbaum P.C. is a New York professional corporation, and Spadea Lignana is a Pennsylvania limited liability company. Plaintiff filed the present lawsuit against Defendants alleging claims for professional negligence, negligent misrepresentation, and negligent supervision. Now before the Court is

Defendants' Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (ECF No. 6), which has been fully briefed. The Court does not believe that oral argument will aid in its disposition of the motion; therefore, it is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f)(2). For the reasons below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss for lack of personal jurisdiction.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.  Black Rock engages Defendants Kestenbaum and HLK P.C.

Plaintiff Sizzling Black Rock Steak House Franchising, Inc. (Black Rock) is a Michigan corporation that franchises restaurants and licenses what it calls a "Restaurant Concept." (ECF No. 7, First Amended Complaint (FAC), ¶¶ 1-3, PageID.123). Specifically, Black Rock owns, operates and franchises restaurants and licenses the Restaurant Concept to area representatives for use in establishing restaurants in specific geographic areas pursuant to area representative agreements. (*Id.* ¶ 3, PageID.123.)

In 2013, Black Rock won first place in a contest called "America's Next Top Restaurant Franchise" (the Contest). (ECF No. 6-2, Declaration of Harold Kestenbaum (Kestenbaum Decl.) ¶ 9, PageID.82.) The prize included free "initial

2

legal services" from Defendant Harold Kestenbaum, who, at the time, ran a firm called Harold L. Kestenbaum, P.C. (HLK P.C.) based in Melville, New York. (*Id.* ¶¶ 4, 7, PageID.81-82.) Kestenbaum's legal practice focuses on franchise law and he is licensed to practice in New York and New Jersey. (*Id.* ¶ 3, PageID.81-82) (FAC ¶ 5, PageID.123.) Kestenbaum was involved in the Contest through an acquaintance, Paul Samson, president of a Contest sponsor called Franchise Edge based in Florida. (Kestenbaum Decl., ¶¶ 6-7, PageID.82). Kestenbaum states that he understood that, after he provided initial legal services at no cost to the Contest winner, that the company would hire Kestenbaum on a monthly retainer. (*Id.* ¶ 8, PageID.82.)

In 2014, Kestenbaum began providing free legal services to the Contest winner, Black Rock, preparing Black Rock's franchise disclosure document and other initial documents over a four to six week period. (Kestenbaum Decl. ¶ 10, PageID.82.) During this time period, Kestenbaum worked with the Contest sponsor, Samson and his partner, Scott Anderson, and had no direct contact with Black Rock or its principals. (*Id.* ¶ 11, PageID.83.)

Black Rock subsequently retained Kestenbaum as its legal counsel for all franchise matters, with a monthly retainer of $1,500 for legal services plus reimbursement of any costs Kestenbaum incurred on Black Rock's behalf. (FAC ¶¶

16-17, PageID.124.) This monthly retainer increased to $2,000 per month beginning in August 2018. (*Id.* ¶ 18, PageID.125.)

### 2.    Kestenbaum prepares the First ARA for Black Rock

Starting in 2015, Black Rock sought to enter into area representative agreements (ARAs), which would grant area representatives the exclusive right to open and operate, or to assist other franchisees in opening and operating, Black Rock Bar & Grill Restaurants in accord with the Restaurant Concept in a specific geographic area. (FAC ¶ 19, PageID.125.) According to Kestenbaum, these ARAs were not limited to Michigan, but also included geographic regions in Florida, Alabama, Georgia, Louisiana, Illinois, Maryland, and Texas. (Kestenbaum Decl. ¶ 13, PageID.83.) Each ARA requires that the area representative develop a certain number of restaurants in accord with deadlines set forth in the ARA's development schedule. (FAC ¶ 20, PageID.125.) In addition, according to Black Rock, a "key, material and necessary provision of each ARA" is that an area representative's failure to comply with the ARA's development schedule would result in termination of the ARA *and* termination of the area representative's right to any future royalties. (*Id.* ¶ 22, PageID.125-26.)

Black Rock explains that, in the franchise industry, royalties which continue to be owed to an area representative based on continuing revenue from Restaurants

opened during the term of an ARA, *after* that ARA is terminated, are commonly known as "Evergreen Royalties." (*Id.* ¶ 21, PageID.125.) Black Rock did not want any ARAs prepared for it to include such Evergreen Royalties. (*Id.* ¶ 22, PageID.125-26.)

In 2015, Kestenbaum, as attorney for Black Rock, prepared an ARA ("the First ARA") between Black Rock and BR Restaurants Holding Company, LLC (BR Restaurants), a company managed by Robert Gries. (FAC ¶¶ 23-24, PageID.126.) This First ARA included a development schedule and provided that BR Restaurants would forfeit royalties if it failed to satisfy the schedule, *i.e.,* the First ARA did not include a provision for Evergreen Royalties. (*Id.* ¶¶ 26-27, PageID.126.) The First ARA was executed by the parties on May 18, 2015. (*Id.* ¶ 28, PageID.126.)

### 3. Kestenbaum prepares the Second ARA for Black Rock

In June 2017, Kestenbaum prepared a second ARA ("the Second ARA") for Black Rock, this time between Black Rock and Black Rock Midwest LLC (BRM LLC). (FAC ¶ 29, PageID.126-27.) The Second ARA included a development schedule requiring BRM LLC to open a certain number of Restaurants within "a defined geographic area"[1] but, unlike the First ARA, this Second ARA did *not*

---

[1] Neither the FAC nor the parties' briefing specifies what the "defined geographic area" is in the Second ARA. However, BRM LLC is a Michigan LLC.

include a clause requiring BRM LLC to forfeit royalties if it failed to comply with the development schedule. Instead, the Second ARA included a provision for Evergreen Royalties. (*Id.* ¶¶ 31-32, PageID.127.) Black Rock alleges that it executed the Second ARA on June 21, 2017, only after Kestenbaum assured Black Rock that the Second ARA did not include a provision for Evergreen Royalties. (*Id.* ¶¶ 33-34, PageID.127-28.)

### 4.    Kestenbaum prepares the Third ARA for Black Rock

In June 2018, Kestenbaum prepared a third ARA ("the Third ARA") as counsel for Black Rock, this time between Black Rock and BR Holdings II, LLC (BRH II). (FAC ¶ 35, PageID.128.) Robert Gries, the managing partner of BR Restaurants (signatory to the First ARA), is also the managing partner of BRH II, and the geographic region at issue in this ARA included Florida, Alabama, Georgia, Louisiana, and Texas. (*Id.* ¶¶ 36-37, PageID.128.) This Third ARA, executed on June 21, 2018, again included a development schedule but, contrary to Kestenbaum's express assurances to the contrary, and like the Second ARA, this Third ARA included a provision for Evergreen Royalties. (*Id.* ¶¶ 37-38, PageID.128.)

In 2020, Black Rock determined that BRH II was not meeting the requirements in the development schedule, and Kestenbaum negotiated a

6

termination of the Third ARA, on behalf of Black Rock. (FAC ¶¶ 40-41, PageID.129.) The negotiated termination agreement, executed on June 19, 2020, included a mutual release which resulted in the discharge of any Evergreen Royalties that would have been due to BRH II under the Third ARA. (*Id.* ¶¶ 43-44, PageID.129.)

### 5.   HLK P.C. merges with Spadea Lignana

On May 1, 2019, Kestenbaum's firm merged with Defendant Spadea Lignana, LLC (Spadea). (FAC ¶ 12, PageID.124.) (ECF No. 10-2, HLK Letter, PageID.190 ("[W]e are excited to announce that effective May 1, 2019 the merger of the law office of Harold L Kestenbaum, PC with the law firm of Spadea Lignana, LLC.").) According to Defendants, Kestenbaum's firm became a contractor for Spadea Lignana on that date. (Kestenbaum Decl. ¶ 18, PageID.84) (ECF No. 6-3, Declaration of Josh Lignana (Lignana Decl.) ¶ 6, PageID.88.) Spadea has two members – Thomas Spadea, a citizen of Pennsylvania, and Josh Lignana, a citizen of New Jersey – and has offices in Pennsylvania and New York only. (Lignana Decl. ¶¶ 3-4, PageID.87.)

### 6. Kestenbaum and Spadea prepare the Fourth ARA for Black Rock

In July 2020, Kestenbaum, now with Spadea Lignana and still representing Black Rock, prepared a fourth ARA ("the Fourth ARA"), between Black Rock and Third Bite of the Apple LLC (Third Bite). (FAC ¶ 46, PageID.129-30.) The Fourth ARA required Third Bite to open a certain number of restaurants in Florida pursuant to the ARA's development schedule. (*Id.* ¶ 47, PageID.130.) Black Rock alleges that it executed the agreement on July 9, 2020, in reliance on Kestenbaum's assurance to Black Rock that the Fourth ARA did not provide for Evergreen Royalties. (*Id.* ¶ 48, PageID.130.)

### 7. Termination of the Second ARA

In late 2020, Black Rock began to consider terminating the Second ARA with BRM LLC because BRM LLC was not meeting the Second ARA's development schedule, having opened only four Restaurants when it was required to open ten. (FAC ¶¶ 49-50, PageID.130.) On December 20, 2020, after reviewing the Second ARA, Jacob Schifko, a Black Rock representative, send an email to Kestenbaum expressing his concern that the Second ARA included a provision for Evergreen Royalties, even though Black Rock expressly directed that its ARAs were not to

include such a provision. (*Id.* ¶¶ 51-52, PageID.130-31.) Specifically, Schifko wrote, in part:

> Please see the attached ARA for review.
>
> Our intent for this agreement was to make it so if the agreement gets terminated for whatever reason before they reach 10 stores developed that they lose all compensation. Including their split of franchise fees, royalty fees and rebates. After review, there seems to be some contradictions throughout….

(*Id.* ¶ 53, PageID.131.) Kestenbaum responded later that same day, stating:

> Jake, it looks like that if they fail to reach 10 units, they loose [sic] the rebate money, but they still get the royalties on what is open and operating as long as they continue to provide the required services. There really is no contradiction. Most ARA deals allow line AR to continue to receive royalties on existing deals after termination as long as they provide services. Unless that was negotiated initially, which it was not, most ARA's allow the royalty payments to continue. But it is clear that unless they have done 10 units, the rebates cease altogether.

(*Id.* ¶ 54, PageID.131-32.)

The following day, December 21, 2020, Kestenbaum's opinion was confirmed by another attorney at Spadea, Andrew Matson, and then reiterated by Kestenbaum in an email. (FAC ¶¶ 55-56, PageID.132.) Schifko responded that same day, expressing frustration with Kestenbaum and stating in part:

> …. I believe you are reckless by not paying attention to what you are doing and what the consequences of your actions actually are. You are putting peoples [sic] lives in jeopardy when we could easily avoid it.

We will continue conversations with Andrew.

(*Id.* ¶ 58, PageID.133.)

Kestenbaum responded by email on December 22, 2020, contending for the first time that the Second ARA included a "catch all" provision such that any default (including a failure to meet the BRM LLC development schedule) would terminate all payments, including Evergreen Royalties. (FAC ¶ 59, PageID.133-34.) Black Rock asserts that Kestenbaum's new theory was directly contrary to Matson's conclusion and Kestenbaum's prior position, and belied by the language of the Second ARA, which Kestenbaum had prepared. (*Id.* ¶ 60, PageID.134.)

When it became clear that BRM LLC would not meet the development schedule, Black Rock terminated the Second ARA with BRM LLC on or about February 3, 2021. (FAC ¶¶ 61-62, PageID.134-35.) On February 9, 2021, Matson again confirmed that the Second ARA requires payment of Evergreen Royalties to BRM LLC. (*Id.* ¶ 63, PageID.135.)

## 8. Black Rock ends its relationship with Kestenbaum, HLK P.C. and Spadea

In May, 2021, Black Rock ended its client relationship with Kestenbaum, Harold L. Kestenbaum, P.C., and Spadea. (FAC ¶ 64, PageID.136.) Black Rock alleges that it is paying approximately $20,000 per month in Evergreen Royalties to

10

BRM LLC, as required by the terms of the Second ARA, and that it anticipates that it will continue to pay that amount for at least 10 years. (*Id.* ¶¶ 65, 67-68, PageID.136.)

### B.    Procedural History

On June 10, 2021, Plaintiff Black Rock filed this legal malpractice action against Defendants Kestenbaum, HLK P.C., and Spadea in the Oakland County Circuit Court. (ECF No. 1-1, Compl.) Defendants removed this action on July 14, 2021, based on diversity jurisdiction. (ECF No. 1, Notice of Removal).

On July 22, 2021, Plaintiff refiled its Complaint pursuant to the Court's prior Order to refile the state court complaint in accordance with the Eastern District of Michigan Local Rules. (FAC.) In the FAC, Plaintiff alleges that Defendants negligently prepared the Second, Third and Fourth ARAs to include a provision for Evergreen Royalties in direct contravention to Black Rock's instruction, and asserts claims for: (1) Professional Negligence by all Defendants;   (2) Negligent Misrepresentation against all Defendants; and (3) Negligent Supervision against Defendant Spadea. (*Id.*)

On July 21, 2021, Defendants filed a Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). (ECF No. 6, Defs.' Mot.) Defendants argue that Kestenbaum and his firm are not subject to general or specific

personal jurisdiction because they have no physical presence in Michigan and have not purposefully availed themselves of the privilege of acting in Michigan. Defendants argue that providing legal services to Plaintiff, relating to franchises around the country, and email and phone communications incident to that representation, are not enough to justify personal jurisdiction. Defendants further argue that Spadea has no physical presence in Michigan, that it only became involved with Plaintiff because Kestenbaum's firm became a contractor of Spadea, and that Kestenbaum and his firm drafted the Second ARA at issue before HLK P.C. became a contractor for Spadea.

Plaintiff Black Rock filed a response in opposition to Defendants' motion to dismiss. (ECF No. 10, Pl.'s Resp.) Plaintiff argues that Defendants Kestenbaum and his firm purposefully availed themselves of the privilege of conducting activities in Michigan when they sought to represent Plaintiff Black Rock as the winning franchise in the contest, and then continued to service Black Rock for seven years and receive payment for these services from Plaintiff in Michigan. Plaintiff further contends that Spadea continues to promote its business in Michigan through its targeted online marketing and interactive website which features content targeted to franchising in Michigan. Finally, Plaintiff argues that the consequences of Defendants' actions were suffered by Plaintiff in Michigan. Plaintiff suggests,

12

alternatively, that this Court can use jurisdictional discovery, and conduct an evidentiary hearing, if necessary, to confirm specific jurisdiction. Finally, if the Court finds it lacks jurisdiction, Plaintiff requests that the Court transfer this matter to the Eastern District of New York pursuant to 28 U.S.C. § 1406(a).

Defendants filed a reply brief arguing, again, that Kestenbaum and his firm did not purposely avail themselves of the privilege of acting in Michigan, advertise in Michigan, or visit Michigan as part of the representation of Black Rock, and that Plaintiff Black Rock itself operates nationally. (ECF No. 11, Defs.' Reply.) Defendants further argue that Spadea's website is a passive website, that Spadea does not market to Michigan "in particular," and that Spadea's website has nothing to do with Plaintiff's claims. Further, Defendants contend that, although Kestenbaum prepared the Fourth ARA after becoming an independent contractor with Spadea, this Fourth ARA concerns a Florida franchisee and Black Rock does not allege any damages arising from this ARA.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) provides for dismissal of a complaint for lack of personal jurisdiction over a party. The party asserting the existence of personal jurisdiction bears the burden of making at least a prima facie showing of its existence. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261-1262 (6th Cir. 1996);

13

*Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997). "Without personal jurisdiction over an individual ... a court lacks all jurisdiction to adjudicate that party's right[s], whether or not the court has valid subject matter jurisdiction." *Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir. 1991).

The Court has three options when faced with a motion to dismiss for lack of personal jurisdiction. The court may: (1) decide the motion on affidavits alone; (2) permit discovery to help rule on the motion; or (3) conduct an evidentiary hearing to decide any remaining factual questions. *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *Serras v. First Tenn. Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir. 1989)). Although the plaintiff always bears the burden of establishing that jurisdiction exists, the method selected by the court to resolve the issue will affect the weight of the burden. *Id.*

When relying on affidavits rather than holding an evidentiary hearing, the facts are viewed in the light most favorable to the plaintiff. *Id.* In addition, a plaintiff need only make a "*prima facie* showing that personal jurisdiction exists in order to defeat dismissal." *Id.* A plaintiff can meet this burden by "establishing with reasonable particularity sufficient contracts between [the defendant] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (quoting *Provident Nat'l Bank v. California Fed. Sav. Loan*

14

*Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)). "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff … alleges collectively fail to state a *prima facie* case for jurisdiction." *CompuServe*, 89 F.3d at 1262. If an evidentiary hearing is held, the plaintiff must demonstrate that jurisdiction is proper by a preponderance of the evidence. *Theunissen,* 935 F.2d at 1465.

While a motion to dismiss would normally be converted to a motion for summary judgment by asking the court to consider additional documents, a Rule 12(b)(2) motion "mirrors in some respects the procedural treatment given to a motion for summary judgment." *Id.* at 1459. As the Sixth Circuit has explained:

> Motions to dismiss under Rule 12(b)(2) involve burden shifting. The plaintiff must first make a prima facie case, which can be done merely through the complaint. The burden then shifts to the defendant, whose motion to dismiss must be properly supported with evidence. Once the defendant has met the burden, it returns to the plaintiff, who may no longer stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction.

*Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020) (internal quotation marks and citations omitted). Unlike a motion for summary judgment, though, a court may not "weigh the controverting assertion[;]" rather, if facts proffered by the defendant conflict with those offered by the plaintiff, a district court does not consider them. *Theunissen,* 935 F.2d at 1459; *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.,* 138 F.3d 624, 626 (6th Cir. 1998).

### III.  ANALYSIS

In a diversity action such as this one, there is a two-part test for determining whether the court may exercise personal jurisdiction over a non-resident defendant. First, the court must determine whether jurisdiction is authorized under the forum state's long-arm statute. *See Air Products & Controls, Inc. v. Safetech Int'l Inc.,* 503 F.3d 544, 550 (6th Cir. 2007). Under Michigan's long-arm statute, specific jurisdiction may be exercised over an individual if, for example, he or she (1) transacts any business within the state; (2) does or causes an act to be done, or consequences to occur, in the state resulting in an action for tort; or [....] (5) enters into a contract for services to be rendered or for materials to be furnished in the state by the defendant. Mich. Comp. Laws § 600.705. If jurisdiction is authorized under the state's long-arm statute, then the court must determine whether the exercise of jurisdiction comports with constitutional due process. *Air Products,* 503 F.3d at 550. Because Michigan's long-arm statute extends to the limits of due process, these two inquiries merge into one and the Court "need only determine whether the assertion of personal jurisdiction … violates constitutional due process." *Aristech Chem.*, 138 F.3d at 627 (internal quotation marks and citation omitted); *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 954 F.2d 1174, 1176 (6th Cir. 1992).

16

Personal jurisdiction can be either general or specific. If a defendant has "continuous and systematic contacts with the forum state," the district court can exercise general jurisdiction over that defendant, allowing a plaintiff to bring any claim against that defendant. *Miller v. AXA Winterthur Ins.*, 694 F.3d 675, 678-79 (6th Cir. 2012). Specific jurisdiction, on the other hand, concerns claims that arise out of or relate to a defendant's contacts with the forum state. *Id.* at 679.

In this case, Defendants argue that they are not subject to general jurisdiction, and Plaintiff Black Rock does not substantively address or oppose this argument. There is no evidence that the Defendants were present or domiciled in Michigan, and thus, in the absence of any meaningful opposition, the Court finds that general jurisdiction does not exist, and instead limits its analysis to the question of whether Plaintiff has made a *prima facie* showing of specific jurisdiction over Defendants.

The Sixth Circuit has established a three-part test (the *Southern Machine* test) to determine if application of a state's long-arm statute meets due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

17

*Southern Machine Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968); *see also Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014) (applying the *Southern Machine* test). Moreover, personal jurisdiction must be analyzed and established over each defendant independently. *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

    **A.**    **This Court Has Specific Personal Jurisdiction Over Defendants Kestenbaum and HLK P.C.[2]**

        **1.**    **Purposeful availment prong**

    Defendants argue that Plaintiff Black Rock cannot establish that Defendant Kestenbaum, and thus Defendant HLK, P.C. as Kestenbaum's principal, purposefully availed themselves of the privilege of acting in Michigan. (Defs.' Mot. at p. 17 & fn.5, PageID.67.) Defendants contend that Kestenbaum did not "come to

---

[2] Although personal jurisdiction must be analyzed and established over each defendant independently, *Days Inns Worldwide*, 445 F.3d at 904, the Court may consider Defendants Kestenbaum and HLK P.C. together because an agent's actions can establish personal jurisdiction over a principal. *See Kroger Co. v. Dornbos*, 408 F.2d 813, 816 (6th Cir. 1969). So if Black Rock can establish personal jurisdiction over Kestenbaum, it can establish personal jurisdiction over HLK P.C. *See id.*; *see also Wetherbee v. Mayor*, No. 14-cv-13891, 2015 WL 144591, at *3 (E.D. Mich. Jan. 12, 2015) ("[I]f the defendant is a principal in an agency relationship, courts can look to the *agent's* contacts with the forum and impute those contacts to the defendant for purposes of finding personal jurisdiction over the defendant.") (emphasis in original).

Michigan; Michigan came to him" through the Contest, and that "it was fortuitous that the contest winner happened to be from Michigan." (*Id.* at p. 18, PageID.68.) Defendants further argue that any communications between Kestenbaum and Plaintiff were "incident to their contract" and insufficient to justify personal jurisdiction. (*Id.* at pp. 19-21, PageID.69-71.)

Plaintiff Black Rock responds that Defendants Kestenbaum and HLK P.C. have purposefully availed themselves of the privilege of conducting activities in Michigan because they sought to represent Black Rock as the Contest's winning franchise, and then furthered that purposeful availment by making the deliberate decision to continue service to Black Rock for the next seven years. (Pl.'s Resp. at pp. 15-16, PageID.176-77.) During that time, Kestenbaum and HLK P.C. (1) prepared four ARAs on behalf of Black Rock beginning in 2014 (including the Second ARA at issue here), (2) prepared and filed annual Franchise Disclosure Documents and Notices of Intent with the Michigan Attorney General on behalf of the eight Black Rock Michigan franchise locations, (3) advised, prepared and negotiated all franchise agreements and related documents for those eight Michigan Black Rock locations, (4) reviewed, prepared and approved transfers of ownerships of four Black Rock locations in Michigan, and (5) accepted payments from Black Rock's headquarters in Michigan on a monthly basis from 2014 until 2021. (*Id.* at

pp. 16-17, PageID.177-78) (ECF No. 10-10, Affidavit of Jacob Schifko (Schifko Aff.) ¶¶ 5-9, 12-13, PageID.266-68.) Black Rock further states that it has and will continue to suffer damages in Michigan as a result of the inclusion of the Evergreen Royalties provision in the Second, Third and Fourth ARAs, "in direct contravention of Black Rock's directions to Kestenbaum" that the ARAs not include such a provision. (Pl.'s Resp. at pp. 17-20, PageID.178-81.)

"Purposeful availment" is the "constitutional touchstone" of specific personal jurisdiction. *Neogen Corp.*, 282 F.3d at 889. To satisfy the first prong of the *Southern Machine* test, a plaintiff must show that a given defendant purposefully availed himself of "the privilege of acting in the forum state or causing a consequence in the forum state." *Southern Machine*, 401 F.2d at 381. "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts or of the 'unilateral activity of another party or third person.'" *Burger King*, 471 U.S. at 475 (internal citations omitted). "Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Id.* (citation omitted and emphasis in original). In particular, where a defendant "has created 'continuing obligations' between himself and the residents of the forum, he manifestly has availed himself of the privilege of conducting

20

business there." *Id.* at 476 (internal citation omitted). In addition, physical presence in a forum state is not required, and the Supreme Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* (citations omitted).

In this case, the Court finds that Defendant Kestenbaum did not "initiate" contact with Black Rock in 2014. However, Plaintiff Black Rock did not "initiate" that contact either. Rather, Defendant Kestenbaum's initial contact with Plaintiff Black Rock in 2014 occurred as a result of both parties' participation in the Contest, when Kestenbaum agreed to provide free legal services to the winner of the Contest, and Plaintiff Black Rock happened to be the winner. Thus, it does not appear that either party actually "initiated" contact with the other. However, even if the Court did find that Plaintiff made the first contact, that fact would not be dispositive. *See Southern Machine*, 401 F.2d at 382 (noting that the allegation that the plaintiff had solicited the licensing agreement from the defendant was immaterial because the fact that the defendant was "fortunate enough to get the business without active solicitation" does not diminish the purposefulness of the defendant's choice to contract with the plaintiff) (*quoting Shealy v. Challenger Mfg. Co.,* 304 F.2d 102, 104 (4th Cir.1962)). In any event, Plaintiff does not appear to complain of the initial free legal work Kestenbaum performed for Black Rock as the winner of the Contest,

which included, according to Kestenbaum, "prepar[ing] Black Rock's franchise disclosure document ("FDD") and other initial documents over a four to six week period." (Kestenbaum Decl. ¶ 10, PageID.82.)

However, Kestenbaum thereafter purposefully entered into an agreement to represent Plaintiff in Michigan, consistent with his stated intent to enter into such a long-term relationship with the Contest winner. (See Kestenbaum Decl. ¶ 8 ("My understanding was that, after I donated my services for the preparation of initial franchising documents, the winning company would put me on a monthly retainer.").) Plaintiff's and Kestenbaum's business relationship continued for seven years – from 2014 through 2021 – during which Kestenbaum prepared a number of ARAs, negotiated and prepared numerous franchise-related documents, and filed a number franchise documents with the state of Michigan.

Kestenbaum argues that his agreement to enter a contract with a Michigan company, or to represent an out-of-state client, is not enough to establish purposeful availment. (Defs.' Mot. at pp. 18-19 & fn.6, PageID.68-69, citing *Power Investments, LLC v. SL EC, LLC*, 927 F.3d 914 (6th Cir. 2019) and *Hilborn & Hilborn, P.C. v. Wolff Ardis, P.C.*, No. 18-13183, 2019 WL 1399974 (E.D. Mich.

Mar. 28, 2019).)[3] Defendants are correct that generally the existence of a contract

with a citizen of the forum state, *standing alone*, will not suffice to confer personal

jurisdiction over a foreign defendant. *Burger King*, 471 U.S. at 478; *Kerry Steel*, 106

F.3d at 151 ("[A]n individual's contract with an out-of-state party alone cannot

automatically establish minimum contacts"); *Alexander-Schauss v. Lew*, 351 F.

---

[3] *Hilborn* is distinguishable from the facts of this case. *Hilborn* involved an action filed in Michigan by a Michigan law firm against a Tennessee lawyer and his firm, for breach of an attorney fee agreement, which was governed by Tennessee law and which was related to the joint representation of a Canadian client in a Tennessee court, involving an accident that happened in Tennessee. *Hilborn*, 2019 WL 1399974 at *1. The court granted the Tennessee defendants' motion to dismiss pursuant to Rule 12(b)(2) because the defendants had not purposefully availed themselves to the benefits and privileges of conducting business in Michigan where they were solicited in their home state (Tennessee) to represent a client in Tennessee, the fee agreement contemplates applying Tennessee law, and any routine emails and phone calls to plaintiff's offices in Michigan during the course of the Tennessee litigation were found to be too attenuated at best. *Id.* at *4.

    *Power Investments* involved an action by a Kentucky resident against Missouri defendants based on the purchase of a commercial property in Missouri. The Sixth Circuit found that the Missouri defendants were subject to personal jurisdiction in the Kentucky court, even though they never entered Kentucky, because they initiated the relationship with the Kentucky plaintiff and communicated extensively for over a year, and the alleged misrepresentations in those communications constituted the core of the plaintiff's fraud claims. *Id.* at 919. The Sixth Circuit explained that only a contract with a "substantial connection" to the forum state, such as a contract "designed to exploit the forum's market" or a "20-year relationship that envisioned continuing and wide-reaching contracts" with the forum, will suffice. *Id.* at 918. As discussed *infra*, the Court finds, reading the facts in the light most favorable to Black Rock, that Kestenbaum and HLK P.C. have such a "substantial connection" with Michigan.

Supp. 2d 635, 639 (E.D. Mich. 2004) ("Contracting with a Michigan resident, mailing letters, or placing phone calls alone are not sufficient to invoke personal jurisdiction.") (citing *Lanier v. American Bd. of Endodontics*, 843 F.2d 901, 907 (6th Cir. 1988)); *see also Sawtelle v. Farrell*, 70 F.3d 1381, 1392 (1st Cir. 1995) ("The mere existence of an attorney-client relationship, unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over the non-resident in the forum state; more is required."); *Trinity Indus., Inc. v. Myers & Assoc., Ltd.*, 41 F.3d 229, 230 (5th Cir. 1995) ("The bare existence of an attorney-client relationship is not sufficient [to establish minimum contacts].").

But that does not mean that the contract or attorney-client relationship should be ignored. When determining if the defendants have availed themselves of the forum state beyond the existence of a contract, the factors for the Court to consider are prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing. *Air Products*, 503 F.3d at 551 (citing *Burger King*, 471 U.S. at 476, 479). In *Air Products*, the Sixth Circuit ultimately found that the defendant company had purposely availed itself of Michigan as a forum for suit as it had maintained a business relationship with the plaintiff for almost nine years; it purchased goods valued in the hundreds of thousands of dollars during that time; it mailed an application to plaintiff in

24

Michigan to open a credit account; and it sent purchase orders to Michigan. *Id.* at 551-52. As such, the Court found that the defendant had engaged in a continuing business relationship and had reached out beyond the borders of the state where it was headquartered to conduct business with a company whose principal place of business it knew to be Michigan. *Id.* The Court thus deemed the defendant's actions to have resulted from deliberate conduct that amounted to purposeful availment. *Id.*

As Plaintiff argues, Defendants Kestenbaum and HLK P.C. did not enter into a "one-time" deal with Plaintiff, but rather engaged in a continuous, seven-year long business relationship wherein Defendants provided legal services to Black Rock in Michigan. According to Plaintiff, during the course of those seven years, Kestenbaum had numerous other contacts with Michigan on behalf of Black Rock, including preparing and filing annual Franchise Disclosure Documents and Notices of Intent with the Michigan Attorney General on behalf of eight franchise locations, preparing all franchise agreements and related documents for those eight Michigan locations, preparing and approving transfers of ownership for four franchise locations in Michigan, and preparing and negotiating four ARAs between Black Rock and others. These contacts and related email or phone communications were made to further the parties' business relationship and created continuous and substantial consequences in Michigan. While, as Defendants point out, some the

25

ARAs Kestenbaum negotiated and prepared for Black Rock involved franchise opportunities in other states, not all did, and, more importantly, it appears that the Second ARA, which is primarily at issue here, involving a Michigan LLC, likely involves franchise locations in Michigan. Thus, Michigan "is the focal point both of the story and of the harm suffered." *See Calder v. Jones*, 465 U.S. 783, 789 (1984) (finding personal jurisdiction over Florida defendants in California for writing an allegedly libelous article about "the California activities of a California resident").

Although Defendant Kestenbaum asserts that he never "set foot in Michigan as part of this representation" and that "[a]ll of [his] communications with Black Rock were through email and phone" (Kestenbaum Decl. ¶ 14, PageID.83), physical presence is not a requirement for purposeful availment. *See Southern Machine*, 401 F.2d at 382 ("Physical presence of an agent is not necessary … for the transaction of business in a state."); *see also Power Investments*, 927 F.3d at 919 (recognizing that physical presence is not required because of the "reality that modern business often occurs electronically and by phone"). Further, in evaluating the quality of contacts, courts do not rely on numerosity alone. "A numerical count of the calls and letters has no talismanic significance." *LAK, Inc. v. Deer Creek Enters.,* 885 F.2d 1293, 1301 (6th Cir.1989). Rather, "[t]he quality of the contacts as demonstrating purposeful availment is the issue, not their number or their status as pre-or post-

26

agreement communications." *Id.* (quoting *Stuart v. Spademan,* 772 F.2d 1185, 1194 (5th Cir.1985)); *see Air Products*, 503 F.3d at 552 (noting that "[m]any" of the contacts and calls were initiated by Defendants and for the purpose of continuing the parties' business relationship); *August v. Manley Toys, Ltd.*, 68 F. Supp. 3d 722, 730-31 (E.D. Mich. 2014) (finding sufficient purposeful availment where nonresident defendant contracted with a resident of Michigan, never visited Michigan, contacted the resident through email and telephone only, and deposited funds into resident's Michigan bank account).

Further, Defendant cannot argue that they targeted their conduct only at Plaintiff and not at Michigan itself. As the Sixth Circuit noted in response to a similar argument, "[i]t would severely limit the availability of personal jurisdiction if every defendant could simply frame his conduct as targeting only the plaintiffs and not the forum state." *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 901 (6th Cir. 2017) ("Schmuckle cannot avoid jurisdiction by framing all of his activities as contacts with plaintiffs—who happen to be in Michigan—instead of contacts with Michigan itself.").

Thus, taking all of the above into consideration, and construing the facts in the light most favorable to Plaintiff, the Court finds that Defendants Kestenbaum and HLK P.C. are not being haled into court in Michigan as the result of "'random,'

'fortuitous' or 'attenuated' contacts or of the 'unilateral activity of another party or third person.'" *See Burger King*, 471 U.S. at 475 (internal and end citations omitted). While Black Rock and Kestenbaum were initially brought together through their participation in the Contest, Kestenbaum subsequently chose to enter into a long-term, seven-year agreement with Black Rock, a Michigan corporation, bearing a substantial connection with Michigan. As in *Air Products*, "the parties did not engage in a one-time transaction, but in a continuing business relationship that last a period of many years. Defendants reached out beyond [New York's] borders to conduct business with a company whose principal place of business it knew to be in Michigan. Such contacts are not 'random,' 'fortuitous,' or 'attenuated,' but are the result of deliberate conduct that amounts to purposeful availment." *See Air Products*, 503 F.3d at 551; *see also Burger King*, 471 U.S. at 473 (stating that parties who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions for consequences of their activities."); *Neogen Corp.*, 282 F.3d at 891-92 (distinguishing between a "one-time, unlikely-to-be-repeated" deal from yearly contracts with forum residents.).

## 2. Arising from prong

The second prong of the *Southern Machine* test is that the plaintiff's cause of action must "arise from" the defendant's contacts with the forum state. *Southern*

28

*Machine*, 401 F.2d at 381; *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000) ("when the operative facts of the controversy arise from the defendant's contacts with the state," the second prong is satisfied). The Sixth Circuit has articulated the standard for this prong in a number of different ways, such as whether the causes of action were "made possible by" or "lie in the wake of" the defendant's contacts, *Lanier*, 843 F.2d at 909, or whether the causes of action are "related to" or "connected with" the defendant's contacts with the forum state. *Youn v. Track, Inc.*, 324 F.3d 409, 419 (6th Cir. 2003) (citation omitted). Although this is a "lenient standard" and the cause of action need not "formally" arise from defendant's contacts, *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002), the cause of action nevertheless must have a "substantial connection" to the defendants' activity in the state. *Schmuckle*, 854 F.3d at 903 (quoting *Bird*, 289 F.3d at 875). And, as with the purposeful availment prong, physical presence in the state is not a requirement in the "arising from" analysis. *See Hahn v. Costway LLC*, No. 20-12396, 2020 WL 6544816, at *4 (E.D. Mich. Nov. 6, 2020).

Defendants focused only on the purposeful availment requirement in their motion and do not specifically address this second prong of the *Southern Machine* test in their briefing, and thus the Court could find that they have waived any argument on this issue. *See Sault St. Marie Tribe of Chippewa Indians v. Engler*,

146 F.3d 367, 374 (6th Cir. 1988) (failure to address an issue constitutes a waiver or abandonment of the argument); *see also Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012) (issues raised in a perfunctory manner are deemed waived); *McPherson v. Kelley*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (citation and quotation omitted).

In any event, given that this second prong is a "lenient standard," and that the cause of action need not "formally" arise from the defendant's contacts, and that Black Rock need only make a *prima facie* showing of jurisdiction under the procedural posture of this case, the Court finds that the causes of action alleged in the Plaintiff's FAC were "made possible by" or "lie in the wake of" or are "related to" Defendant Kestenbaum's activity in Michigan; namely, the Kestenbaum's preparation of the Second ARA for Plaintiff in Michigan, which included the Evergreen Royalties provision, that has resulted in alleged damages to Plaintiff. *See Theunissen*, 935 F.2d at 1461 (explaining that a cause of action arises from purposeful availment if the cause of action would not exist but for the contacts cited).

30

Thus, the Court find that this second prong of the *Southern Machine* test is satisfied as to Defendants Kestenbaum and HLK P.C.

### 3. Reasonableness prong

The third and final prong of the *Southern Machine* test mandates that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *See Southern Machine*, 401 F.2d at 381; *Youn*, 324 F.3d at 419. However, "[i]f prongs one and two of the *Southern Machine* test are satisfied, then there is an inference that the reasonableness prong is satisfied as well." *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005). If the third prong is considered, there are four factors for the Court to analyze: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy. *CompuServe*, 89 F.3d at 1268. The burden of traveling to the forum state, alone, is an insufficient reason to make jurisdiction unreasonable. *Youn*, 324 F.3d at 420.

As with the second prong, Defendants do not address this third prong and thus the Court could find that they have waived this argument. *See Sault St. Marie Tribe*, 146 F.3d at 374; *Clemente*, 679 F.3d at 497; *McPherson*, 125 F.3d at 995-96. But,

31

considering this prong, the Court finds that it is reasonable to hold Defendants Kestenbaum and HLK P.C. to account in Michigan for the work performed for Black Rock over a seven year period.

First, as discussed above, there is an inference of reasonableness when the first two *Southern Machine* prongs are satisfied. *Intera Corp.*, 428 F.3d at 618. Further, although it would be a burden on Defendants to travel from New York to Michigan for this litigation, Michigan clearly has an interest in protecting a company whose principal place of business is located in Michigan, Plaintiff Black Rock has an interest in obtaining relief for its claims based on the work Defendants provided to Black Rock in Michigan, and the parties have not identified another state that has a greater interest in resolving this controversy. *See Air Products*, 503 F.3d at 555.

Therefore, for all the reasons discussed above, the Court finds that the exercise of jurisdiction over Defendants Kestenbaum and HLK P.C. is reasonable under the circumstances. The Court therefore DENIES Defendants' Kestenbaum and HLK P.C.'s motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2).

32

**B.     This Court Does Not Have Specific Personal Jurisdiction Over Defendant Spadea**

As stated above, personal jurisdiction must be analyzed and established over each defendant independently. *Days Inns Worldwide*, 445 F.3d at 904. Thus, the Court turns its jurisdictional analysis to Defendant Spadea.

**1.     Purposeful availment prong**

Defendants argue that the Court lacks personal jurisdiction over Defendant Spadea. (Defs.' Mot. at pp. 21-24, PageID.71-74.) Defendants assert that Spadea became involved with Plaintiff Black Rock only because Kestenbaum's firm became a contractor for Spadea in 2019. (*Id.*) Spadea argues that the Second ARA at issue in this case was negotiated and entered *before* Kestenbaum became a contractor for Spadea and thus *before* he was an agent for Spadea. And, Defendants continue, the Fourth ARA, which was the only ARA negotiated after Kestenbaum became a contractor for Spadea, has not caused any damages to Plaintiff. (*Id.*) Defendants further point out that Plaintiff's negligent supervision claim against Spadea only involves that Fourth ARA. (*Id.*)

Plaintiff responds that Spadea was "aware that Kestenbaum had clients and did business in Michigan" at the time of the merger in 2019, and that Spadea "independently sought work in Michigan through its own interactive Website"

33

which "appears as the top ad result on Google when a natural search is done of 'Michigan Franchise Lawyers.'" (Pl.'s Resp. at pp. 21-22, PageID.182-83.) Plaintiff contends that Spadea "features *an entire page dedicated to what Spadea clients need to know about franchising in Michigan on its Website.*" (*Id.* (emphasis in original).) Finally, Plaintiff argues that Spadea furthered its relationship with Plaintiff and Michigan when it continued to represent Black Rock in numerous matters and billed Black Rock for services rendered following the 2019 merger. (*Id.* at p. 22, PageID.183.)

First, the Court finds that Spadea's advertising nationally through Google AdWords does not rise to the level of purposeful contact with Michigan "required by the Constitution in order to exercise personal jurisdiction over the advertiser." *Sports Auth. Michigan, Inc. v. Justballs, Inc.*, 97 F. Supp. 2d 806, 812 (E.D. Mich. 2000) (finding that plaintiff's advertising nationally, primarily online, is not a sufficiently purposeful contact with the forum state) (citing *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994)).

Second, addressing Spadea's website, https://www.spadealaw.com, the question of whether an out-of-state defendant who operates a website is subject to personal jurisdiction in the forum state based on that website depends on the level of "interactivity of the website." *Audi AG v. D'Amato*, 341 F. Supp. 2d 734, 742

34

(E.D. Mich. 2004) (citing *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 418-19 (9th Cir.1997)). Courts have stated that there are three levels of interactivity of websites:

> The first category is highly interactive which is the ability to download and enter into contracts. This category is sufficient for a Court to exercise personal jurisdiction. The second category is a middle ground in which defendant maintains an interactive website which permits the exchange of information between users in another state and the defendant, which depending on the level and nature of the exchange, may be a basis for jurisdiction. The last category is where the defendant makes information available on an otherwise passive website. A passive website is insufficient to establish purposeful availment for the purpose of due process.

*Id.* at 742-43 (internal quotation marks and citations omitted).

Defendant Spadea asserts that its website is a passive website and thus it is insufficient to establish purposeful availment with Michigan. (Defs.' Reply at pp. 4-5, PageID.286-87.) As Defendants correctly point out, Plaintiff does not explain what is "interactive" about the website. A review of Spadea's website shows that it consists primarily of passively-posted information. The website does not offer to sell any product or include the ability to download and enter into contracts, but it does provide contact information for the Philadelphia and New York offices, phone number and email contact information for Spadea's attorneys, and also includes a

phone number to call as well as a form that a user can fill out and submit online for "get[ting] in touch" with the firm for a free consultation.

Generally, "the publication of a web page, without more, is not an act by which a party purposefully avails itself of the privilege of conducting business in the forum state." *Sports Auth.*, 97 F. Supp. 2d at 813 (citing *Cybersell, Inc.*, 130 F.3d at 418 (finding that the district court lacked jurisdiction over defendant despite the fact that the web site invited visitors to e-mail defendant)). Rather, "the presence of electronic mail access, a printable mail-in order form, and a toll-free number do not amount to 'anything more than a passive advertisement which is not grounds for the exercise of personal jurisdiction.'" *Sports Auth.*, 97 F. Supp. 2d at 813 (citing *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 337 (5th Cir. 1999)). Because Spadea's website does not provide the ability to download and enter into contracts, or to purchase any goods or services through the website, but only allows for an exchange of information, it is primarily passive and could, at best, be classified as a "middle ground" website that may be a basis for jurisdiction "depending on the level and nature of the exchange." *D'Amato*, 341 F. Supp. 2d at 743 (citation omitted).

However, even if primarily passive, Spadea's website does hold itself out as welcoming Michigan business. As Plaintiff points out, Spadea's website offers a dedicated page to Michigan which states that Spadea's lawyers are "Franchise

36

Lawyers Servicing Michigan," and it provides general information regarding franchising in Michigan as well as a photo of Spadea's partners, including Kestenbaum, in front of a sign stating "Welcome to the Great Lakes – We Love Franchising." (Pl.'s Resp. at pp. 7, 21-22 PageID.168, 182-83, citing Ex. D, ECF No. 10-5, Website pages, PageID.228-33.) Plaintiff argues that the website thus intentionally targets Michigan and Michigan clients. (*Id.*). The Court notes that the website also asserts, when looking at other states' individual pages, such as Indiana's, that Spadea "work[s] with franchises in Michigan[.]" https://www.spadealaw.com/franchise-law/indiana-franchise-lawyers.

Defendant Spadea argues that its website offers a menu of all 50 states and that many states' links lead to the same page with general information, and thus that Spadea "does *not* market to Michigan in particular" but "to all 50 states through a passive website." (Defs.' Reply at p. 5, PageID.287 (emphasis in original).) *See King v. Ridenour*, 749 F. Supp. 2d 648, 656 n. 5 (E.D. Mich. 2010) (finding that a website that included an "asbestos exposure locator" with links to all 50 states listing physical locations where asbestos may be found did not constitute advertising in Michigan because "[t]o find that locator sufficient advertising to constitute purposeful availment in Michigan would mean that [the defendant law firm] has purposefully availed itself of the privileges of acting in all fifty states simply by

37

virtue of its website. This would be an odd result."). This argument that Spadea markets to all states does not lessen the fact that it appears to expressly market its services to Michigan residents.

Construing the facts in the light most favorable to Plaintiff, the Court could consider Spadea's website, along with its contacts with Plaintiff in this case following the 2019 merger, including its involvement in Black Rock's termination of the Second ARA with BRM LLC, and the attending consequences of Evergreen Royalty payments, and the negotiation and preparation of the Fourth ARA, as sufficient purposeful availment of the privilege of doing business in Michigan for the purpose of due process. *See Neogen Corp.*, 282 F.3d at 891 (defendant's primarily passive website along with 14 yearly contracts with Michigan customers sufficient evidence of purposeful availment of the privilege of doing business in Michigan). However, this issue need not be decided because, even assuming, *arguendo*, that Spadea's contacts, including its website, could be found to satisfy the purposeful availment prong of the *Southern Machine* test, Plaintiff Black Rock cannot make a prima facie showing that Spadea's website has anything to do with Plaintiff's claims in this lawsuit, which are primarily based on the Second ARA. As discussed below, Plaintiff does not claim that Spadea's website had anything to do

with Plaintiff's relationship with Spadea or with Plaintiff's claims in this lawsuit about the Second ARA.

### 2. Arising from prong

As explained above, the second prong of the *Southern Machine* test is whether the current controversy is related to Defendant Spadea's forum-related activities. *Southern Machine*, 401 F.2d at 381.

Plaintiff Black Rock primarily alleges, with respect to Defendant Spadea, that Spadea and Kestenbaum negligently prepared the Fourth ARA, which concerned a Florida franchisee, and that Spadea negligently supervised Kestenbaum's preparation of that Fourth ARA. (FAC ¶¶ 75, 91-92.)[4] Plaintiff does not allege that Spadea had any involvement with the negotiation or preparation of the First, Second or Third ARAs, which were prepared by Kestenbaum prior to the 2019 merger of the two firms. (FAC ¶¶ 73-75, PageID.137.) (Defs.' Mot. at pp. 23-24, PageID.73-74.) Plaintiff alleges only that a Spadea lawyer, Matson, was involved in some communications regarding the termination of the Second ARA and the applicability of Evergreen Royalties. (FAC ¶¶ 55-56, 63, PageID.132, 135.) Thus, Plaintiff fails

---

[4] Although Plaintiff alleges Count II, Negligent Misrepresentation, against all Defendants, Plaintiff only complains of Kestenbaum's alleged misrepresentations and does not mention Defendant Spadea in that Count at all. (See FAC ¶¶ 78-86, PageID.138-40.)

to plead that Defendant Spadea is liable for the preparation of the First, Second or Third ARAs.

Focusing on the Fourth ARA, with which Plaintiff does allege Spadea was involved, Plaintiff does not allege any damages arising from that ARA, and instead only speculates that the Fourth ARA *might* result in damages. However, the Fourth ARA is not at issue unless the area representative, Third Bite, fails to meet the development schedule under the Fourth ARA *and* Plaintiff elects to terminate that ARA. Plaintiff does not plead that either of those events have happened. Under Michigan law, remote, contingent, or speculative damages cannot be recovered in a tort action. *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 96 (2005) (citations omitted). "A plaintiff asserting a cause of action has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable." *Id.* (citation omitted). Further, while Plaintiff Black Rock argues in its response brief that it seeks indemnification from Spadea with respect to the Fourth ARA, it would not be effective nor a proper exercise of this Court's jurisdiction to render premature advisory opinions concerning possible future indemnification. *See Wakefield Leasing Corp. v. Transamerica Ins. Co.*, 213 Mich. App. 123, 126 (1995) (affirming

trial court's decision to reserve judgment concerning possible future indemnification under insurance contract).

Thus, Plaintiff Black Rock can proceed in this action for damages based only on the Second ARA, which it asserts has resulted in damages.[5] Plaintiff does not allege that Spadea was involved in preparing this Second ARA, which included the Evergreen Royalties provision at issue, and thus Spadea's primarily passive website, Spadea's preparation of the Fourth ARA, and Spadea' submission of bills to Black Rock starting in 2019, has nothing to do with Plaintiff's claims based on the preparation of the Second ARA, including the Evergreen Royalties provision. In other words, Plaintiff's claims based on this Second ARA do not arise or flow from Spadea's website, Spadea's involvement with preparation of the Fourth ARA, or its submissions of bills to Plaintiff. *See Carter v. Univ. of Texas at Dallas*, No. 20-1714, 2021 WL 243811 (6th Cir. Jan. 20, 2021) (finding that district court properly granted defendants' motion to dismiss for lack of personal jurisdiction because plaintiff's "claim that the defendants have refused to provide her with verification that she completed her 2004 internship does not 'arise out of or relate to' the defendants'

---

[5] Plaintiff Black Rock pleads that it negotiated a termination of the Third ARA that included a release from BRH II, which discharged any claim for Evergreen Royalties. (FAC ¶¶ 41-44.) Thus, the Third ARA (which was negotiated and entered before Kestenbaum merged with Spadea) cannot result in a claim for damages.

contacts with Michigan," which included "recruitment of students, online classes, sports contracts, sale of sports memorabilia, and the sale of articles online"); *Bird*, 289 F.3d at 875 (noting that the second *Southern Machine* factor requires that the cause of action have a "substantial connection with the defendant's in-state activities").[6]

### 3.    Reasonableness prong

The parties devote no argument to this factor. In light of the fact that Plaintiff pleads that Defendant Spadea was only involved in the Fourth ARA between Black Rock and Third Bite to develop restaurants in Florida, and that Fourth ARA has not provided for any claim for damages by Plaintiff, the Court finds that it is not reasonable, at this time, to exercise personal jurisdiction over Defendant Spadea.

### C.    Transfer Pursuant to 28 U.S.C. § 1406(a)

Plaintiff requests, at the end of its response brief, that "should this Court determine that it lacks jurisdiction, … that this Court [exercise its discretion and] transfer this matter to the Eastern District of New York." (Pl.'s  Resp. at p. 23, PageID.184.) Defendants recognize that this Court has the discretion to transfer the

---

[6] Plaintiff makes a cursory argument that, if necessary, the Court could conduct jurisdictional discovery to affirm specific personal jurisdiction, but fails to articulate any specific questions of fact that need resolution.

case or simply dismiss it, and argues that because Plaintiff "should have foreseen that the defendants are not subject to personal jurisdiction in Michigan," the Court should dismiss this case. (Defs.' Reply at p. 7, PageID.289.)

A court may *sua sponte* transfer a civil case to a different venue "[f]or the convenience of the parties and witnesses, in the interest of justice…." 28 U.S.C. § 1404(a). *Hite v. Norwegian Caribbean Lines*, 551 F. Supp. 390, 394 (E.D. Mich. 1982) (citing *Norwood v. Kirkpatrick,* 349 U.S. 29, 32 (1955)). "In fact, 28 U.S.C. § 1404(a) does not require a motion; a district court may transfer a case sua sponte." *Carver v. Knox Cnty., Tenn.*, 887 F.2d 1287, 1291 (6th Cir. 1989) (footnote omitted).

Because the Court finds that is has personal jurisdiction over Defendants Kestenbaum and HLK P.C., it will deny Plaintiff's request. Plaintiff Black Rock and its employees are located here in Michigan and the "interest of justice" does not appear to favor transferring the case to New York. Moreover, it does not appear that Plaintiff can state a claim at this time against Spadea based on the Fourth ARA, which has not resulted in any damages.

## IV.   CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). Specifically, the Court **DENIES** the motion to dismiss

as to Defendants Kestenbaum and HLK P.C., but **GRANTS** the motion to dismiss as to Defendant Spadea. The Court further **DENIES** Plaintiff's request in its Response brief to transfer this case to the Eastern District of New York.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: December 17, 2021