UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SIZZLING BLACK ROCK
STEAK HOUSE FRANCHISING,
INC.,
     Plaintiff,
     v.

HAROLD L. KESTENBAUM, PC
and HAROLD L. KESTENBAUM,
     Defendants.
_____/

Case No. 21-11621

Paul D. Borman
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (ECF No. 62)**

I.      **Introduction**

In 2015, Plaintiff Sizzling Black Rock Steak House Franchising, Inc., sought

to grow the number of its restaurants by entering into area representative

agreements ("ARAs"). The ARAs would grant area representatives ("ARs") the

exclusive right to open and operate restaurants or to assist franchisees to open and

operate restaurants in a specific geographic area. These agreements typically

provide for the AR to receive royalties based on gross sales generated by the

restaurants they open or assist opening. "Evergreen" royalty provisions,

sometimes contained in ARAs, require the franchising company to continue paying

royalties to the AR after the ARA is terminated for failure to develop the agreed

number of restaurants, so long as the AR performs their contractual duties on the restaurants they opened.  In other words, an evergreen royalty agreement allows the AR to continue servicing the restaurants they opened and earn royalties from those restaurants after the contract is terminated for the AR's failure to open the number of restaurants it promised.  Without such a provision, the AR would no longer service any restaurants, and also would not receive any royalties.

Evergreen royalty provisions are the focal point of this lawsuit.  Defendants Harold Kestenbaum and Harold Kestenbaum, PC, are sued for legal malpractice and negligent misrepresentation in drafting ARAs for Plaintiff that contain evergreen royalty provisions.  Black Rock says it made its desire to exclude evergreen royalties in its ARAs clear but Kestenbaum negligently disregarded Black Rock's intention and included evergreen royalties and otherwise drafted contradictory and incoherent ARAs.

Defendants moved for summary judgment on September 29, 2023.  (ECF No. 62).  The undersigned held a hearing on the motion on March 28, 2024.  For the reasons below, the undersigned **RECOMMENDS** that the motion for summary judgment be **GRANTED IN PART, DENIED IN PART**.

## II.   Summary of Facts

### A.   First ARA

Black Rock executed an ARA with BR Restaurants Holding Company, LLC, the "First ARA," on May 18, 2015.  The factual dispute begins here.  Black Rock asserts that the First ARA includes no provision for evergreen royalties. (ECF No. 64, PageID.3959).  There are two subsections of the First ARA that are contradictory, or at least create ambiguity.  Article 12 lays out the "obligations upon termination or expiration" of the agreement.  (ECF No. 62-6, pageID.1232). Section 12.1(i) states that if the AR fails to fulfill the obligations to develop the required number of restaurants (a failure to adhere to the "development schedule"), Black Rock will allow the AR to continue operating all opened restaurants and will keep receiving royalties from those restaurants.  (*Id.* at PageID.1233, § 12.1(i)). This is an evergreen royalties provision.  In the next subjection, 12.1(j), the ARA says that the AR "shall immediately and permanently forfeit all rights to earn any portion of . . . royalty fees . . . after termination of this Agreement."  (*Id.* at PageID.1233, § 12.1(j)).  So there is both an evergreen royalties provision and one that appears to terminate all rights under the agreement.

Paul Samson, an owner of BR Holding Company, LLC (ECF No. 62-15, PageID.2425), testified that the holding company and Black Rock specifically addressed or negotiated the evergreen royalty provision in the First ARA.  (*Id.* at PageID.2448-50).  Kestenbaum, during his deposition, agreed that Section 12.1(i) cuts off evergreen royalties in the event of a termination.  (ECF No. 62-13,

PageID.2237). In briefing, Black Rock says that the First ARA did not include evergreen royalties "in accord with Plaintiff's directions." (ECF No. 64, PageID.3959). Black Rock did not support the assertion that it gave this direction with citation to the record.

On April 30, 2018, Kestenbaum sent BR Holding Company a default and notice to cure, outlining several breaches of the ARA. (ECF No. 62-17). On May 31, 2018, Kestenbaum gave notice to the holding company that the First ARA was terminated for cause effective that day. (ECF No. 62-18, PageID.2699). Damages are not claimed under the First ARA.

B.    Second ARA

1.    Drafting

The Second ARA is between Black Rock and area representative Black Rock Midwest, LLC. The record contains the discussions and edits of the various drafts of this ARA.

The first version of the Second ARA (emailed to Jacob Schifko and Branden Morganroth, Plaintiff's representatives) contained the same two contradictory or ambiguous subsections as the First ARA—one giving evergreen royalties if the agreement terminates because of failure to meet the development schedule (Article 12.1(i)), and the next terminating all royalties if the agreement is terminated (Article 12.1(j)). (ECF No. 62-19, PageID.2730, March 21, 2017 first draft of

4

Second ARA).  Plaintiff Black Rock again points to Article 12.1(j) to say that the initial version did not include evergreen royalties.  (ECF No. 64, PageID.3959). On March 31, 2017, Branden Morganroth, copying Schifko, sent redlined comments on the Second ARA back to Kestenbaum.  A suggested addition to Article 12.1(i) (the evergreen royalties provision) states that if the AR "[d]oes not complete development schedule they can not continue to sell in the area but will continue to support the sold, operating, or executed agreements.  In the event they default, at no point can they sell the development area – they must forfeit to us." (ECF No. 62-21, PageID.2788, March 31, 2017 version of Second ARA).

Neither party acknowledges the suggested addition to Article 12.1(j), which, as originally written, terminates royalties if the ARA is terminated.  Branden Morganroth's suggested change to this subsection is to include a line stating that royalties will be terminated on termination of the agreement if the AR "does not open a minimum number of stores [illegible] are automatically forfeited to us." (*Id.* at PageID.2789).

Kestenbaum made some changes to the proposed Second ARA and sent it to Schifko and Branden Morganroth on May 22, 2017.  In this version, Article 12.1(i) reads:

> You shall immediately and permanently forfeit all rights
> to earn any portion of additional initial franchise fees,
> royalty fees and/or transfer fees paid to us by franchisees
> in the Development Area; for any new franchises ~~limited~~

to franchises we didn't develop but not with regard to
existing Restaurants we developed so we continue to
receive royalties and rebates after the termination of this
Agreement[.]

(ECF No. 62-22, PageID.2846, May 22, 2017 version of Second ARA)

(strikethrough in original).  Article 12.1(j) reads that on termination of the ARA for

any default, the AR will be required to pay liquidated damages.  This provision is

now materially different from 12.1(j) in previous drafts and from 12.1(j) in the

First ARA.  (*Id.*).

This version of the agreement contains another evergreen royalty provision

at Article 11.4.  Article 11 addresses default and termination.  Section 11.4 states

that failure to meet the development schedule is a default giving Plaintiff the right

to terminate the agreement.  However, if the AR is otherwise in compliance with

the agreement, Plaintiff would not have the right to terminate the agreement and

the AR could continue to service the opened restaurants.  The AR would continue

receiving royalties in that circumstance.  (*Id.* at PageID.2844).

Sometime during the discussions on the Second ARA, Plaintiff Black

Rock's president, Lonny Morganroth, spoke with Kestenbaum about evergreen

royalties.  Lonny Morganroth testified that he told Kestenbaum that the only way

Black Rock would allow evergreen royalties is if the AR "seeded" (opened) ten

restaurants.  (ECF No. 62-10, PageID.1473, 1535, 1590; Lonny Morganroth

deposition).  Defendants contest that they were told that evergreen royalties should
be permitted only if the AR opens at least ten restaurants.

Mr. Guggemos, attorney for the AR, produced versions of the Second ARA
edited by Branden Morganroth.  At the end of Article 12.1(i), the evergreen
royalties subsection, Morganroth wrote "TBD W/ 11.2."  (ECF No. 62-25,
PageID.2908, 2967, 3025).  Article 11.2 discusses the ability to cure after notice of
a default.  (*See id.* at PageID.2905).  In a footnote in the response brief, Black
Rock says the "TBD W/ 11.2" signified that Branden Morganroth had questions
and concerns about evergreen royalties that needed to be addressed.  (ECF No. 64,
PageID.3972, n. 13).  This assertion is unsupported in the record.  Black Rock
points to more redline changes, including responses from Kestenbaum, that it says
show Kestenbaum's confirmation that royalties were unavailable unless the AR
had developed at least ten stores.  (*Id.*).  In this version of the evergreen royalties
provision, the subsection provides for payment of royalties for existing restaurants
after default for failure to open the required number of restaurants.  It includes a
redline addition stating,

> after the PARTIAL TERMINATION of this Agreement,
> but you [sic] will forfeit your portion of any payments
> from approved suppliers to which you are entitled as set
> forth in Section 4.5 above if less than ten (10)
> Restaurants are not opened PRIOR TO THE PARTIAL
> TERMINATION OF THIS AGREEMENT OR IF THE
> TERMINATION IS BASED UPON A DEFAULT

UNDER ARTICLE 5 WHICH IS NOT CURED
DURING THE APPLICABLE CURE PERIOD.

(ECF No. 64-13, PageID.4472) (omitting strikethrough text).  At the end of that statement is "THIS IS OK" next to the "TBD W/ 11.2," which is stricken-through. (*Id.*).  As written in this version, only payments from suppliers would be terminated if the AR failed to open ten stores.  The date of this revision is unclear. From Plaintiff's perspective, the "OK" comment was assurance from Kestenbaum that Plaintiff's concerns about not including evergreen royalties had been addressed.  (ECF No. 64, PageID.3961).

On June 9, 2017, Kestenbaum, Guggemos, Schifko, the Morganroths, and others representing the AR in the Second ARA exchanged emails about evergreen royalties.  Branden Morganroth confirmed that in Article 11.2, the AR will "keep their share if the default is for not meeting the development schedule."  (ECF No. 62-27, PageID.3054).  He asked whether 12.1(i) should apply to all stores to correlate with 11.2.  (*Id.*).  Kestenbaum replied that any termination based on Article 5 stops payment of any fees to the AR, and that "12 (i) should apply to Article 5 terminations."  (*Id.* at PageID.3053).

On June 12, 2017, Kestenbaum emailed Guggemos, Schifko, and Branden Morganroth stating, in pertinent part, that he added language to 12.1(i) "stating that an Article 5 termination cuts off the payments of royalties and rebates on existing locations."  (ECF No. 62-28, PageID.3056).  In emails later in June 2017, Mr.

Guggemos stated that he made additional changes to many sections, including 12.1(i) and (j) for review. The copy of the agreement attached to emails reflects that the AR will forfeit rights and royalties for new franchises, not existing restaurants, in the event of Partial Termination, but the AR will forfeit all payments from suppliers if the AR has not opened ten restaurants. (ECF No. 62-30, PageID.3147, § 12.1(i), June 20, 2017 version of Second ARA). Section 12.1(j) states nothing with regard to royalties. Branden Morganroth's later edits to versions of the Second ARA do not include changes to 12.1(i) or (j). (ECF No. 62-32).

Kent Ward, who was involved with the AR during the negotiations, testified that initially Lonny Morganroth did not want to include evergreen royalties in the ARA, but then agreed to it. According to Ward, Lonny Morganroth said that the AR should still get royalties as long as it continued its obligations. Ward said that evergreen royalties were important to the AR. (ECF No. 62-16, PageID.2639).

Lonny Morganroth signed the final version of the Second ARA on June 21, 2017. This version contained evergreen royalty provisions in Articles 11.4 and 12.1(i). (ECF No. 62-7, PageID.1296). Also included in Article 2.1 is the statement that the agreement will remain in effect unless terminated, excluding a partial termination defined elsewhere. It states that both parties "acknowledge that this Agreement shall be 'Evergreen.'" (*Id.* at PageID.1276).

Plaintiff's legal expert, Michael Garner, opined that Section 11.4 is internally contradictory.  The section opens stating that if the AR does not meet the development schedule, it will be in default and Black Rock will have the right to terminate.  Next, the section states that if the AR doesn't satisfy this obligation, Black Rock will not have the right to terminate with respect to existing restaurants, and it will continue to receive royalties on those restaurants.  Mr. Garner says this is contrary to Plaintiff's instructions.  (ECF No. 62-40, PageID.3521-22).  Mr. Garner further notes that Section 12.1(i), which provides for evergreen royalties for existing restaurants after partial termination, does not refer to the "10 Restaurant Condition." (*Id.* at PageID.3522).  He opined that a lay person could not understand the contradictory and incoherent language that granted the AR the right to continued royalties. (*Id.* at PageID.3525-26).

> 2.    Termination

At the end of 2019, Black Rock and Black Rock Midwest, the area representative, agreed to amend the Second ARA so that Black Rock Midwest would have to open five restaurants instead of ten by the end of 2020.  (ECF No. 62-33, PageID.3491, 3493).  By the end of 2020, it became clear that the AR would not meet the amended requirement, so Black Rock began contemplating terminating the ARA.  (ECF No. 7, PageID.130, at ¶ 49).

Kestenbaum and Mr. Schifko exchanged emails on December 20 and 21, 2020, discussing whether royalty payments would be due if the agreement was terminated for failure to open enough restaurants. On December 20, 2020, Mr. Schifko, on behalf of Black Rock, emailed Kestenbaum stating that it was their intent that if the agreement was terminated for any reason before the AR opened ten restaurants, the AR would lose all compensation including royalties. (ECF No. 62-34, PageID.3494). In response, Kestenbaum wrote that termination before ten restaurants would result in termination of rebates but not royalties, which coincides with the language of the contract. (*Id.*). On December 21, 2020, Kestenbaum explained that royalties would be due for existing restaurants if the agreement was terminated only for failure to open restaurants, but no royalties would be due if the ARA was terminated for cause under Article 5. (ECF No. 64-6, PageID.4308). In response, Schifko claimed that Kestenbaum made a mistake in the Second ARA in Section 12.1(j). He accused Kestenbaum of being reckless by not paying attention and not making sure the documents match the client's intent. (*Id.* at PageID.4307). The next day, Kestenbaum sent an email outlining another theory on the Second ARA. This time, Kestenbaum says that Article 5.13 is a "catch all" provision that says failure to comply with all "other requirements" in the agreement results in default, which under Article 5 is a complete termination (Plaintiff characterizes this as an attempt to "cover up his mistake" (ECF No. 64, PageID.3962)). He said

that the development schedule "would be considered as an 'other requirement.'" (ECF No. 65-7, PageID.4310).  So if Black Rock terminated under Article 5 for failure to meet the development schedule, it would not have to pay royalties on existing restaurants.  This appears to be the last interaction Kestenbaum had with Plaintiff.  Attorney Andrew Matson took over for Kestenbaum after the merger of Kestenbaum PC and Spadea Lignana, LLC.

On February 4, 2021, Branden Morganroth emailed Matson to say that they were considering terminating the ARA because the AR did not adhere to the development schedule.  (ECF No. 62-36).  Matson emailed Schifko on February 9, 2021, to say that terminating the ARA for failure to open the requisite number of restaurants would not result in full termination of the agreement, i.e., royalties would be due on existing restaurants.  (ECF No. 64-8, PageID.4312).

In the meantime, Black Rock knew that the AR was not performing all obligations, such as inspecting each restaurant monthly, disregarding brand standards to have a frozen Coke machine in each restaurant, and failing to use local advertising methods.  Its representatives acknowledged that the attorney (Kestenbaum or Matson) told them they could terminate the agreement in full for these failures, including terminating all royalties, if the issues were not cured within 30 days.  (*See* ECF No. 62-10, PageID.1489, 1640, 1658 (Lonny Morganroth deposition); ECF No. 62-11, PageID.1742-43, 1761, 1829 (Branden

12

Morganroth deposition); ECF No. 62-12, PageID.1994, 2018-19, 2059, 2068 (Jacob Schifko deposition)). The company did not send a termination letter upon learning of the deficiencies because they first wanted to give the AR "a common courtesy" and opportunity to cure. (ECF No. 62-10, PageID.1640).

In early March 2021, Schikfo and Matson exchanged emails discussing Black Rock's options. Schifko asked if they could do a full termination of the agreement because of the AR's failure to do monthly inspections of existing restaurants. He also acknowledged that the AR could not cure that deficiency because they could not go back in time to inspect restaurants. Matson said that if the AR was aware of their obligations, Plaintiff could argue that the ARA should be terminated, and he agreed that the AR cannot cure the failure. (ECF No. 64-11, PageID.4428-29). That said, Matson did not think the contract should be fully terminated because it could end up with a "fight" that would be costly. (*Id.* at PageID.4429). To keep the business relationship, Matson suggested a partial termination for failure to meet the development schedule. (*Id.* at PageID.4427). Eight minutes later, Schifko said they decided to do a partial termination. (*Id.*).

On March 12, 2021, Black Rock, through its corporate counsel Lawrence Flaggman, sent a letter to the AR partially terminating the Second ARA for failure to meet the development schedule and collecting liquidated damages. (ECF No. 62-37). Black Rock continues to pay royalties to the AR for existing restaurants.

C.     Third ARA

Plaintiff and BR Holdings II, LLC, executed an ARA, the Third ARA, on

June 21, 2018.  This agreement has roughly the same evergreen royalty provisions

as the Second ARA.  (ECF No. 62-8, PageID.1358).  Kestenbaum prepared the

Third ARA.  This agreement was mutually terminated.  Black Rock is not paying

evergreen royalties on this ARA.  (ECF No. 62-38).

D.     Fourth ARA

On July 6, 2020, Plaintiff entered into a Fourth ARA with Third Bite of the

Apple LLC, containing the same evergreen royalty provision as the Second and

Third ARAs.  (ECF No. 62-9, PageID.1413).  It appears this agreement is still in

effect.

**III.    Analysis and Recommendations**

A.     Governing Standards

Summary judgment is mandated "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to the party's case, and on which that party will

bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  A motion for summary judgment shall be granted "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might

affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). When evaluating a motion for summary judgment, the

Court "views the evidence, all facts, and any inferences that may be drawn from

the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc.*

*v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of

material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486

(6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing

if a party "fails to properly address another party's assertion of fact," then the court

may "consider the fact undisputed for purposes of the motion"). "Once the moving

party satisfies its burden, 'the burden shifts to the nonmoving party to set forth

specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d

446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an

affirmative showing with proper evidence in order to defeat the motion."

*Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro.*

*Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The

nonmovant must, however, do more than simply show that there is some

metaphysical doubt as to the material facts, there must be evidence upon which a

reasonable jury could return a verdict in favor of the non-moving party to create a

genuine dispute.") (internal quotation marks and citation omitted).  In other words,

summary judgment is appropriate when "a motion for summary judgment is

properly made and supported and the nonmoving party fails to respond with a

showing sufficient to establish an essential element of its case. . . ."  *Stansberry*,

651 F.3d at 486 (citing *Celotex Corp.*, 477 U.S. at 322-23).

    B.    <u>Discussion</u>

    Defendants makes four arguments: (1) New York law applies to this action,

(2) they are entitled to judgment on the legal malpractice claim, (3) allegations

about the preparation of the Second ARA are time-barred, and (4) the negligent

misrepresentation claim is duplicative of the legal malpractice claim, so it should

be dismissed.  Plaintiff contends that there are genuine issues of material fact on

the legal malpractice and negligent misrepresentation claims, and that Michigan

law applies to this timely action.

    1.    Choice of Law

    To determine the source of law applicable in this diversity jurisdiction case,

the Court applies the choice of law principles in the forum state, Michigan.  *Klaxon*

*v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941).

    Defendants suggest that Michigan applies a two-part choice of law test

found in Sections 187 and 188 of the Restatement (Second) of Conflict of Laws.

(ECF No. 62, PageID.1109-10) (citing *Uhl v. Komatsu Forklift Co*., 512

F.3d 294, 302 (6th Cir. 2008)). Section 187 concerns the parties' choice of law stated in a contract between the parties. Neither party proposes that their legal representation agreement contained a choice of law provision, so § 187 does not apply. Similarly, § 188 applies in the absence of an "effective choice of law" in the parties' contract. In short, neither provision applies. *See also D.O.N.C. v. BPH Michigan Grp., LLC*, 2023 WL 7923725, at *3 (E.D. Mich. Nov. 16, 2023) ("In resolving conflict issues *in contract cases*, Michigan courts follow § 187 and § 188 of the Restatement (Second) of Conflict of Laws.") (quoting *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 699 (Mich. 1995) (emphasis added).

Under applicable Michigan choice-of-law rules, the Court applies Michigan law unless a "rational reason" to do otherwise exists. *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 286 (1997) (citing *Olmstead v. Anderson*, 428 Mich. 1 (1987)). There is a two-step analysis to decide whether a rational reason exists. First, Michigan law requires the Court to determine whether the foreign state has an interest in having its law applied and if not, the presumption that Michigan law will apply cannot be overcome. *Id.* Second, if a foreign state has an interest in having its law applied, the court must then determine whether Michigan's interests mandate that Michigan law be applied, despite the foreign interests. *Id.* Although this analysis "most frequently favors the forum (Michigan's) law, Michigan courts nonetheless use another state's law where the

other state has a significant interest and Michigan has only a minimal interest in the matter." *Hall v. Gen. Motors, Corp.*, 582 N.W.2d 866, 868 (Mich. Ct. App. 1998).

Defendants insist that New York law should apply because New York is responsible for regulating attorneys admitted to practice in that state and has a "materially greater interest" in whether Kestenbaum committed malpractice. (ECF No. 62, PageID.1110). Plaintiff says that application of Michigan law will not impact the New York Bar's ability to discipline Kestenbaum. It also argues that Michigan has a substantial interest in ensuring that Michigan corporations like Plaintiff, that primarily conduct their business in Michigan, are protected by Michigan's legal malpractice laws. (ECF No. 64, PageID.3966).

Kestenbaum PC is a New York law firm and Mr. Kestenbaum is licensed to practice law in New York. New York regulates the practice of law for those admitted to practice in the state. New York has an interest in having its law applied here, given that it has an interest in ensuring that its attorneys fulfill their professional obligations.

That said, Michigan has the greater interest, or at least more than a minimal interest, in having its law applied. Plaintiff is a Michigan-chartered corporation headquartered in Michigan and primarily conducting business in Michigan. (ECF No. 64, PageID.3966-67). As stated in the Court's order addressing personal

jurisdiction, Plaintiff and Kestenbaum's business relationship continued for seven years during which Kestenbaum prepared ARAs, negotiated and prepared franchise-related documents, and filed franchise documents with the state of Michigan.  (ECF No. 12, PageID.428, 431).  Moreover, expanding a Michigan franchise concerns Michigan interests.  Michigan has an interest in the health and growth of its corporations, as well as the financial stability and employment potential of those corporations.  This is so even though Black Rock has restaurants outside of Michigan.  Thus, it is not the case that New York "has a significant interest and Michigan has only a minimal interest in the matter."  *Hall*, 582 N.W.2d at 868.  Michigan legal malpractice law should apply.

The practical effect of this determination is minimal.  Defendants concede that Michigan and New York legal malpractice laws are similar.  (ECF No. 62, PageID.1111, n. 13); *see Insituform Techs., Inc. v. Per Aarsleff A/S*, 534 F. Supp. 2d 808, 812 (W.D. Tenn. 2008) (citation omitted) ("Where no actual conflict exists, 'the court may ignore choice of law questions and apply forum law.'").  They differ, however, in the statute of limitations for legal malpractice claims.  Plaintiff points out that even if the Court concludes New York substantive law applies, Michigan law would still govern the statute of limitations question.  (ECF No. 64, PageID.3966).  Plaintiff is correct.  "Under Michigan's common law choice of law rule, statutes of limitation are considered procedural and are

governed by the law of the forum." *Czewski v. KVH Indus., Inc.*, 607 F. App'x

478, 480 (6th Cir. 2015) (quoting *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 746

(6th Cir. 1999)).  Defendant concedes that Michigan law would, in the normal

course, apply to the statute of limitations question.  But here, they argue that courts

routinely apply the statute of limitations of the forum state when it has a more

significant relationship to the parities and the occurrence.  (ECF No. 65,

PageID.4537).  They cite an unpublished district court case filed years before

*Czewski*.  Since the undersigned has determined that Michigan's interests are not

outweighed by New York's, Michigan law will be applied to all claims.

        2.    Legal Malpractice

To establish a legal malpractice claim in Michigan, a plaintiff must

demonstrate: (1) the existence of an attorney-client relationship; (2) negligence in

the legal representation of the plaintiff; (3) that the negligence was the proximate

cause of an injury; and (4) the fact and extent of the injury alleged.  *Simko v. Blake*,

532 N.W.2d 842, 846 (Mich. 1995) (citations omitted).  The first element is

uncontested.  If there is an attorney-client relationship, a duty to use and exercise

reasonable care, skill, discretion, and judgment in the representation of the client

exists as a matter of law.  *Id.*  (citation omitted).

Before addressing the claim, it should be noted that the parties' arguments relate only to the Second ARA, i.e., whether Kestenbaum was negligent in his work on the Second ARA.  Plaintiff only seeks damages from the Second ARA.

a.    Negligence

A retained attorney is held to a standard of care that requires them "to use and exercise reasonable skill, care, discretion and judgment in the conduct and management thereof." *Eggleston v. Boardman*, 37 Mich. 14, 16 (1877).  Expert testimony is often required to establish the standard of care, the breach of that standard, and causation.  *Rose v. Black*, 2000 WL 33426202, at *2 (Mich. Ct. App. Apr. 21, 2000); *see also Mayer v. Weiner*, 2018 WL 7680611, at *6 (E.D. Mich. Dec. 10, 2018) (collecting authority).

Relying primarily on New York law, Defendants argue that Black Rock cannot establish negligence because its representatives were aware of the contents of all four ARAs before execution, including the evergreen provisions in each. They note that Plaintiff's representatives participated in negotiating and drafting the Second ARA (in which many drafts and revisions were exchanged), executed all the ARAs, and are experienced franchisors who would understand the contents of representative agreements.  (ECF No. 62, PageID.1112).  They therefore argue Black Rock is deemed to have understood the ARAs and was aware of the evergreen royalty provisions as a matter of law, thus clearing them of any

negligence.  They maintain that if a client could sue their attorney years after an agreement is executed complaining about the contents of that agreement or that the attorney did not explain the provisions, it would open the flood gates to litigation by clients unhappy with the outcome of that agreement.

In response, Black Rock argues its representatives could not be expected to understand the terms of the Second ARA.[1]  Further, Black Rock argues that the Second ARA was so contradictory and incoherent that a lay person could not understand it.  Plaintiff's legal standard of care expert, Michael Garner, opined that Kestenbaum's work on the Second ARA fails to reflect both Plaintiff's intent and the standard of care owed by New York attorneys and those practicing franchise law.  Mr. Garner's opinion is grounded in the understanding that Plaintiff's

---

[1] One argument advanced in the briefing is that Plaintiff's representatives told Kestenbaum they did not have college degrees and could not understand complex legal documents.  (ECF No. 64, PageID.3970).  Tracing Plaintiff's citations to the record in this part of its argument, it appears Plaintiff stretches the facts somewhat to say that its representatives told Kestenbaum about their inability to understand the ARAs.  Lonny Morganroth testified that he did not have a college degree and he believed Kestenbaum when he said the First ARA did not contain evergreen royalties.  (ECF No. 62-10, PageID.1491).  Morganroth did not say he told Kestenbaum he did not have a college degree and did not understand the documents.  In a separate part of the response brief, Plaintiff cites Morganroth's testimony that he told Kestenbaum he did not read well and needed to talk about contract provisions one-on-one.  (*Id.* at PageID.1485).  Morganroth also testified that he did not read sections 11.3 and 11.4 in the ARA, instead relying on Kestenbaum to tell him what was in the contract over the phone.  (*Id.* at PageID.1589-90).  Before signing the agreement, he asked Kestenbaum if the document contained everything they had discussed and relied on Kestenbaum to represent Plaintiff's best interests.  (*Id.* at PageID.1593).  In the part of Jacob Schifko's testimony cited by Plaintiff, Schifko testified that Kestenbaum was told that the AR was not to keep a revenue stream unless they reached ten restaurants.  (ECF No. 62-12, PageID.1910-11).  Schifko did not say he could not understand the documents or needed to orally confirm their contents.

representatives informed Kestenbaum that they would not agree to evergreen

royalties before ten restaurants were opened.  To illustrate the confusing nature of

the ARAs, Plaintiff looks to the First ARA.  There, Subsection 12.1(i) has an

evergreen royalties provision.  But the next subjection says the AR forfeits rights

to royalty fees after termination of the agreement, without condition or

modification.  (ECF No. 62-6, PageID.1233).  Kestenbaum confirmed that Section

12.1(i) cuts off evergreen royalties in the event of a termination.  (ECF No. 62-13,

PageID.2237).  So viewing the facts in the light most favorable to Plaintiff, the

First ARA does not have evergreen royalties, or at least there is a question of fact.

On that point, Plaintiff says it reasonably believed the Second ARA likewise did

not include evergreen royalties.  (ECF No. 64, PageID.3970-71).

There are questions of material fact relating to whether Kestenbaum used

reasonable care and skill to draft the ARAs that satisfied Plaintiff's intentions and

legally accomplished its objectives.  To begin, there is a dispute of fact as to

whether anyone told Kestenbaum that Plaintiff would not agree to allow evergreen

royalties until the AR opened at least ten restaurants.  There is also a question of

fact about the meaning behind Branden Morganroth's "TBD w/ 11.2" and

Kestenbaum's response, "This is OK," next to the evergreen provision in a draft of

the Second ARA.  Was this Morganroth's questioning the propriety of the

provision and Kestenbaum saying that the provision was not providing for

evergreen royalties?[2]  Or does it mean that both Morganroth and Kestenbaum understood that evergreen royalties were allowed even without a ten-restaurant minimum?  And, in a March 31, 2017, redlined version of the document sent to Kestenbaum from Branden Morganroth, someone (presumably Morganroth) suggested adding language that if the AR does not complete the development schedule it could continue servicing the restaurants it opened, and that all fees and royalties would be forfeited if the AR has not opened ten restaurants.  (ECF No. 62-21, PageID.2788-89).  So there is some evidence that as late as March 2017, Plaintiff's representatives were making their desire for a ten-restaurant minimum known.  There is a dispute about how to interpret the First ARA.  This matters because Plaintiff insists that it assumed the following ARAs would match the First ARA and exclude evergreen royalties.  Kestenbaum interprets the agreement to include an evergreen royalties provision, but also testified that the subsection after cuts off evergreen royalties if the contract is terminated.  Finally, Plaintiff's unrebutted legal expert opines that the Second ARA was drafted in a confusing manner such that a lay person could not read and understand precisely how and when royalties would be cut off.

---

[2] Kestenbaum testified that he recalled writing "This is OK."  (ECF No. 62-13, PageID.2280).

These disputes of fact are material because if a jury resolves them in Plaintiff's favor, then the negligence element is satisfied because Plaintiff continues to pay royalties to the AR despite the AR's failure to meet the development schedule and other requirements in the Second ARA. The conclusion would mean that Kestenbaum did not use reasonable skill and care in drafting an agreement that did not meet Plaintiff's desires and was not in Plaintiff's best interest.

True, Plaintiff's representatives read, or are presumed to have read, the agreement and then signed and executed it. The Michigan Supreme Court "has many times held that one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms." *Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel*, 596 N.W.2d 915, 920 (Mich. 1999) (citation omitted). "The general presumption that a signatory knows the nature of a document is not applicable when the neglect to read the document is due to fraud, coercion or mistake." *Viking Corp. v. Van Dyke*, 2011 WL 1262143, at *3 (Mich. Ct. App. Apr. 5, 2011) (citing *Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471, 475 (Mich. 2005)). Defendants use this legal presumption (albeit under New York law) to say they were not negligent in drafting because Plaintiff knew what was in the agreement and signed the agreement.

It is unclear, however, that this presumption based in contract law applies in the legal malpractice context. The undersigned is unaware of case law that absolves an attorney of negligence in drafting an agreement just because the client read and signed the agreement, and Defendants pointed to none. Such a rule would effectively eliminate legal malpractice claims grounded in an attorney's drafting of a document for the client. Rather, this presumption applies between the parties to an agreement. Even if clients are presumed to have read and understood the document, the lawyer is legally obligated to draft documents using reasonable skill and care to meet the client's objectives and to support their best interests. The facts here do not suggest that the client affirmatively approved of the inclusion of the evergreen royalties provision as written as part of a negotiation with the AR. This is not unlike cases in which clients challenge their counsel's work in divorce or settlement agreements. Courts in those cases do not decide there was no negligence because the clients read and agreed to the contents of the agreements. "[L]egal professionals [are] hired to forge binding agreements and are best equipped to detect any fatal flaws." *Inv. Ventures, Inc. v. Hertz, Schram & Saretsky*, 2007 WL 1989102, at *4 (Mich. Ct. App. July 10, 2007) (*Winkler v. Carey*, Case No. 255193) (O'Connell, J., dissenting). Therefore, despite Plaintiff's status as a knowledgeable franchisor, it relied on its attorney to draft a document that reflected its wishes and best interests. So the argument that Defendants cannot

be found negligent because the client read and executed the agreement is not well taken.

b.    Proximate Causation

To prove proximate cause in a legal malpractice claim, Plaintiff must establish that the Defendants' actions were a cause in fact of the claimed injury—paying evergreen royalties under the Second ARA. *Charles Reinhart Co. v. Winiemko*, 513 N.W.2d 773, 775-76 (Mich. 1994). To establish proximate cause, the plaintiff must prove that the defendant's negligence was both the cause in fact and legal cause of the injuries. *Weymers v. Khera*, 563 N.W.2d 647, 652 (Mich. 1997). Cause in fact requires the plaintiff to "present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Pontiac Sch. Dist. v. Miller, Canfield, Paddock & Stone*, 563 n.W.2d 693, 699 (Mich. 1997) (citation omitted). The mere possibility of causation in fact is not enough and speculation or conjecture cannot support causation. *Id.* (citations omitted). Legal cause requires a showing that it was foreseeable that the conduct would create a risk of harm, and that the result of that conduct and intervening causes were foreseeable. *Farrow Grp., Inc. v. Dunn*, 2023 WL 5319270, at *4 (Mich. Ct. App. Aug. 17, 2023) (citation omitted); *Inv. Ventures, Inc.*, 2007 WL 1989102, at *3-4.

Defendants argue first that Plaintiff cannot establish causation because it is speculative that the AR would have accepted the terms of an ARA that excluded evergreen royalties, and that a person associated with the AR testified that there would have been no agreement without evergreen royalties.[3] (ECF No. 62, PageID.1114; ECF No. 62-13, PageID.2269).  Plaintiff says that there is evidence that the AR would have accepted alternative terms—the AR agreed it would only continue to receive administrative fees and rebates from suppliers if it did not meet the ten-restaurant minimum.  (ECF No. 64, PageID.3973).

There is a question of fact as to whether the AR would not have accepted other terms, so the Court should not determine causation.  "[W]hen the facts bearing upon causation are not in dispute, and reasonable persons could not differ about the application of legal concepts of causation to those facts, the court determines the issue."  *Inv. Ventures, Inc*., 2007 WL 1989102, at *4 (citation omitted).  Kent Ward, a person associated with the AR in the Second ARA, testified that evergreen royalties were crucial to the agreement, but his testimony is not conclusive on the issue.  As Plaintiff notes, the AR agreed to cutoff other kinds of payments if it did not meet the development schedule.  Plaintiff also asserts that

---

[3] Defendants said that the AR's representative, Kent Ward, testified that the AR would not have accepted an ARA without evergreen royalties.  The transcript page they cite, however, does not include testimony that the AR would not have accepted an agreement without evergreen royalties.  (*See* ECF No. 62-16, PageID.2650; ECF No. 62, PageID.1114).

even if the AR would not have accepted alternative terms, Plaintiff still would be

in a better position because it would have retained the rights to royalties from

already-existing restaurants and could itself develop in the geographic region.

(*Id.*).  These are issues best left to a jury to decide.

Defendants next argue that Plaintiff cannot establish proximate cause

because it voluntarily chose not to terminate the Second ARA for cause, which

would have terminated all royalties.  Plaintiff's representatives raised the issue, via

email to Kestenbaum and Matson, about the AR's failure to meet some of its

obligations, such as inspecting each restaurant every month.  According to the

Second ARA, failure to perform Article 5 duties, without a cure, would result in

full termination and loss of all rights to the AR.  Both Kestenbaum and Spadea

attorney Matson told Plaintiff's representatives about the option for full

termination.  (ECF No. 64-6, PageID.4308, Kestenbaum email dated December 21,

2020).  Plaintiff's representative Mr. Schifko told Matson they were considering a

full Article 5 termination for failure to inspect restaurants because that failure

could not be cured.  (*See* ECF No. 64-11, PageID.4429).  Matson agreed that this

failure allows Plaintiff to fully terminate the agreement, but advised not sending a

termination letter because there may be a costly legal fight.  (*Id.* at PageID.4428-

29).  In any event, Matson later suggested negotiating a deal to avoid terminating

the contract to keep the relationship going.  (*Id.* at PageID.4429).  Eight minutes

later, Schifko said they wanted to do partial termination for failure to meet the development schedule, not a full termination for an Article 5 default. (*Id.*).

Defendants assert that Plaintiff disregarded its attorney's advice to terminate the agreement, and thus avoided a chance to pay no royalties.

In response, Plaintiff argues that it could only partially terminate the contract. First, it says that the AR would have had an opportunity to cure, and the only non-curable default was failure to meet the development schedule which only permitted a partial termination. (ECF No. 64, PageID.3974). There is a question of fact here because on December 22, 2020, Kestenbaum told Branden Morganroth that failure to meet the development schedule could count as an Article 5 default under a catch-all provision. (ECF No. 64-7, PageID.4310). Defendants did not press this position at oral argument.

In emails with Matson, Plaintiff's representative Schifko stated that the failure to inspect restaurants was a non-curable default because the AR could not go back in time. Defendants pointed to this problem at oral argument—since the AR could not cure the fact that it did not inspect restaurants, full termination was always an option. Plaintiff resists this conclusion arguing that it defies a common sense reading of Article 5. Under Defendants' reading (of the agreement Kestenbaum drafted), everything the AR failed to do each month would be incurable because the AR could never go back and do what it was required to do.

For instance, the failure to have a frozen Coke machine in each restaurant is not something that could be cured except from the point at it which it was given notice of the default.  Cures only work in the future.  Article 5 is not written as a means for the plaintiff to catch a missed obligation and terminate the contract because the other party couldn't un-miss that obligation.  At the very least, this is an issue for the jury to decide—how to interpret Article 5 and whether Plaintiff could terminate for failure to meet the development schedule, inspect restaurants, or any other obligation.  This is especially so considering Kestenbaum told Plaintiff failure to meet the development schedule could constitute Article 5 default, and Matson agreed with Plaintiff's representative that failure to inspect stores was incurable default under Article 5.  In short, issues of material fact remain for the jury, so the Court should not make a ruling on causation.

Finally, Defendants' contention that Plaintiff failed to follow legal advice to terminate the ARA contradicts Matson's last stated advice not to terminate, but instead to negotiate new terms and do only a partial termination.

In a footnote, Plaintiff contends that the argument that it could have terminated the Second ARA is "sophistry" because it would not have been in the position of contemplating termination but for Kestenbaum's negligence.  (ECF No. 64, PageID.3974, n. 14).  This is not true.  Plaintiff was contemplating terminating

the contract for many reasons, none to do with having to pay evergreen royalties. (*See* ECF No. 64-11, PageID.4430, Schifko email dated February 4, 2021).

        c.      Damages from Second ARA

"Like other torts, a legal malpractice plaintiff may not recover contingent or speculative damages." *Est. of Knudsen by Long v. Fieger*, 2019 WL 1049681, at *11 (Mich. Ct. App. Mar. 5, 2019) (citing *Law Offices of Lawrence J. Stockler, PC v. Rose*, 436 N.W.2d 70, 81 (Mich. Ct. App. 1989)).

Defendants argue that damages are speculative, unascertainable, and cannot be recovered. For instance, if the restaurants opened under the Second ARA close, no future evergreen royalties will be due, so future damages are speculative. (ECF No. 62, PageID.1117). In response, Plaintiff points out that it has already paid a substantial amount in evergreen royalties to the AR under the Second ARA. These damages are easily ascertainable. As for future damages, a damages expert estimated future royalty payments of $1,716,449. (ECF No. 64, PageID.3976). Defendants have not rebutted Plaintiff's damages expert.

Damages are not speculative. As Plaintiff points out, it has been paying evergreen royalties under the Second ARA. If damages are awarded, reimbursement of royalties paid is easily calculable. And since Defendant has not presented contrary expert evidence about future damages, it is hard to credit their argument that future damages are too speculative to award. A determination is

unnecessary at this time since there are issues of material fact bearing on the merits of the legal malpractice claim.

### 3.   Statute of Limitations

Defendants argue that allegations of malpractice surrounding the Second ARA are time-barred by the statute of limitations.  They cite New York's three-year statute of limitation but acknowledge Michigan's two-year statute of limitation.  As addressed above, Michigan law applies.[4]

The period of limitations is two years for malpractice claims.  Mich. Comp. Laws § 600.5805(8).  Michigan's legal malpractice-specific statute provides, in pertinent part,

> (1) An action for legal malpractice against an attorney-at-law or a law firm shall not be commenced after whichever of the following is earlier:
>
> (a) The expiration of the applicable period of limitations under this chapter.
>
> (b) Six years after the date of the act or omission that is the basis for the claim.

---

[4] Michigan has a borrowing statute, Mich. Comp. Laws § 600.5861, which states, "An action based upon a cause of action accruing without this state shall not be commenced after the expiration of the statute of limitations of either this state or the place without this state where the cause of action accrued[.]"  Defendants do not argue that the cause of action accrued outside of Michigan.  Had they, the undersigned still would recommend applying Michigan's statute of limitations.  Courts determining whether to apply borrowing statutes must consider if the Michigan connections in a case are "merely tangential" or "essential facts giving rise to the cause of action."  *CMACO Auto Sys, v. Wanxiang Am. Corp.*, 589 F.3d 235, 247 (6th Cir. 2009).  The choice of law discussion, above, shows that the Michigan connection is more than tangential.

> (2) A legal malpractice action that is not commenced
> within the time prescribed by subsection (1) is barred.

Mich. Comp. Laws § 600.5838b.  "Consistent with those statutory provisions, [the

Michigan Court of Appeals and] Supreme Court have held that the applicable

statute of limitations for legal-malpractice claims is two years."  *Bishop & Heintz,*

*P.C. v. Finch*, 2016 WL 3749388, at *2 (Mich. Ct. App. July 12, 2016) (citing *Sam*

*v. Balardo*, 308 N.W.2d 142, 146 (Mich. 1981)).

As a preliminary matter, in briefing Plaintiff confuses the two-year statute of

limitation with the six-year statute of repose in Mich. Comp. Laws §

6060.5838b(1)(b).  (ECF No. 64, PageID.3977).  The Michigan Court of Appeals

explained the difference:

> While statutes of repose and statutes of limitation both
> create temporal barriers to a claim's viability, each
> functions differently. "A statute of repose prevents a
> cause of action from ever accruing when the injury is
> sustained after the designated statutory period has
> elapsed.  A statute of limitation, however, prescribes the
> time limits in which a party may bring an action that has
> already accrued."

*Frank v. Linkner*, 871 N.W.2d 363, 368-69 (Mich. Ct. App. 2015), *aff'd in part,*

*rev'd in part*, 894 N.W.2d 574 (Mich. 2017) (quoting *Sills v. Oakland Gen. Hosp.*,

559 N.W.2d 348 (1996)).  Plaintiff did not argue that the statute of repose applies.

Michigan law provides that a legal malpractice claim cannot be filed after either

the two-year limitations period or six years after the act that forms the basis of the

claim, "*whichever is earlier*." *Finch*, 2016 WL 3749388, at *2 (emphasis in original). The two-year statute of limitations applies, not the six-year statute of repose.

Whether the claim is time-barred turns on when the claim accrued. Section 600.5838(1) provides that a legal malpractice claim "accrues at the time that person discontinues serving the plaintiff in a professional . . . capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim." Black Rock says the relationship with Kestenbaum did not end until May 2021, when it stopped paying a monthly fee for legal services, so its July 2021 lawsuit is timely. (ECF No. 64, PageID.3977-78). Defendants contend that the claim accrued at the execution of the Second ARA in June 2015 since the allegation is that Kestenbaum negligently drafted that document, i.e., the matter out of which this lawsuit arose. (ECF No. 65, PageID.4543, n. 9).

Outwardly, Defendants' argument is understandable, but courts in Michigan do not interpret the statute that narrowly. Michigan courts focus on nature of the professional relationship to determine the accrual point of a malpractice claim in an ongoing relationship like Plaintiff and Defendants had. For instance, in *Morgan v. Taylor*, 451 N.W.2d 852 (Mich. 1990), the Michigan Supreme Court determined that the claim accrued at the end of the professional relationship, even though the

35

alleged malpractice occurred more than two years before the lawsuit was filed.
There, the plaintiff had an optometry appointment with the defendant optometrist
in 1981.  Testing revealed intraocular pressure beyond the normal range.  The
defendant did not refer the plaintiff to a specialist.  At the next eye exam, in 1983,
testing again revealed pressure above the normal range.  This time, the defendant
referred the plaintiff to a specialist.  The specialist diagnosed glaucoma that
reportedly should have been diagnosed in 1981.  *Id.* at 182-83.  The question
before the court was whether the malpractice claim accrued at the time of the 1981
visit or in 1983 when glaucoma was diagnosed.  The court homed in on the phrase
"*accrues* at the time that person *discontinues treating or otherwise serving* the
plaintiff in a professional" capacity, known in Michigan as the "last treatment
rule."  *Id.* at 185 (emphasis in original).  The court commented on the rationale for
the rule in the context of a medical malpractice claim involving treatment for a
particular injury or illness.  The rationale is that the physician-patient relationship,
and its accompanying air of trustworthiness, would induce the patient to take no
action against the doctor while the treatment continued.  *Id.* at 188.  In such cases,
the limitations period does not begin to run until an occurrence indicates that the
professional relationship was terminated.  *Id.* at 189.  There, the claim accrued not
at the time of the failure to refer the plaintiff to a specialist in 1981, but when the

plaintiff was referred in 1983.[5]  The continuing eye examinations were held to

constitute "the matters out of which the claim for malpractice arose."

In another case, *Levy v. Martin*, 620 N.W.2d 292 (Mich. 2001), defendant

accountants prepared tax returns for the plaintiff from 1974 until 1996.  An

Internal Revenue Service audit found the plaintiff owed additional taxes for 1991

and 1992.  The plaintiffs sued their accountants in 1997 for malpractice.  *Id.* at 293.

The defendants moved to dismiss the claim as beyond the two-year malpractice

statute of limitations.  In determining the accrual point, the court gave weight to

the fact "that [the] plaintiffs, rather than receiving professional advice for a specific

problem, were receiving generalized tax preparation services from [the]

defendants."  *Id.* at 297.  This mattered because during that continuing relationship,

the plaintiff did not have cause to question the accountants' work until the end of

the professional relationship.  *Id.* at 295-97.  The court noted that the result may

have been different if the defendants had presented evidence that the annual tax

preparations constituted "discrete transactions" unrelated to other transactions.  But

the defendants did not present evidence that each income tax preparation was a

transaction that should be considered to separately constitute "the matters out of

which the claim for malpractice arose."  *Id.* at 297, n. 19.  "Accordingly, [the]

opinion does not mean, for example, that if an accountant prepared income tax

---

[5] The "last treatment rule" no longer applies to medical malpractice claims.

returns for a party annually over a period of decades, the statute of limitations for alleged negligence in preparing the first of these tax returns would not run until the overall professional relationship ended." *Id.* In other words, the accrual point depends on the agreement between the parties or the nature of the professional relationship.

Put another way, "if a plaintiff receives professional services for a specific event out of which an injury arises, as well as related continuing services, the end of the continuing services, not the specific event, constitutes 'the matters out of which the claim for malpractice arose.'" *Bernstein v. Seyburn, Kahn, Ginn, Bess, & Serlin Corp.*, 2014 WL 688652, at *3 (Mich. Ct. App. Feb. 20, 2014) (citing *Levy,* 620 N.W.2d 292). In *Bernstein*, the attorney was sued for legal malpractice for not explaining the import of documents signed by Bernstein and for acting in the best interests of his partner alone, not both his and his partner's best interests. The relationship lasted over a decade, during which the attorney helped the plaintiff and his partner form new partnership arrangements, increasingly leaving the plaintiff out of profits (to put it simply). *Id.* at *1-3. The attorney's work was characterized as "general legal services." *Id.* at *4. The claim arose out of the performance and accrued at the end of the general legal services to plaintiff. *Id.*; *see also Nugent v. Weed*, 455 N.W.2d 409 (Mich. 1990) (attorney performed general legal services for more than a decade; lawsuit filed more than two years

after the date of instances of malpractice was timely because it was filed within two years of the date of last rendered professional services).

A dissenting opinion from the Michigan Supreme Court noted tension between finding an accrual date to occur when the professional services end regardless of when the alleged malpractice occurred and the statutory language modifying the date services end as to "the matters out of which the claim for malpractice arose."  The dissent in *Levy* pointed out that this line of cases ignores the import of the modifying phrase of the accrual statute and "fail[s] to acknowledge and give effect to the plain language of the *entire* sentence comprising subsection 5838(1), thereby rendering the modifying phrase 'matters out of which the claim for malpractice arose' superfluous."  620 N.W.2d at 300 (emphasis in original).  The dissent would find the accrual point where the malpractice allegedly occurred, even if the relationship were a continuing one. The dissent also noted that the "last treatment rule" was judicially created when Michigan did not have a malpractice accrual statute, suggesting it is unnecessary to have such a rule now.  *Id.* at 299.

As this is a diversity jurisdiction case, the Court interprets state statutory provisions as would a Michigan court.  *Swix v. Daisy Mfg. Co., Inc.*, 373 F.3d 678 (6th Cir.2004).  Michigan courts, thus far, interpret the accrual statute to mean that

a malpractice claim accrues when the professional relationship ends regardless of when the alleged malpractice occurred.

Plaintiff construes the relationship with Kestenbaum and his firm as "routine, periodic, or [providing] related services" such that its claims did not accrue until the relationship ended in 2021.  (ECF No. 64, PageID.3977).  The undersigned agrees that Kestenbaum and his firm provided generalized legal services to Plaintiff throughout the duration of the relationship, rather than providing discrete legal services.  Indeed, Plaintiff paid Kestenbaum (or his firm) a monthly fee until May 2021.  Further, in its personal jurisdiction analysis the Court found Kestenbaum's business relationship with Plaintiff continued for seven years during which Kestenbaum prepared ARAs, negotiated and prepared franchise-related documents, and filed franchise documents with the state of Michigan. (ECF No. 12, PageID.428, 431).  The evidence shows that Kestenbaum was hired to do more than draft ARAs, and certainly to do more than draft the Second ARA. He was Plaintiff's counsel for any franchise matters that arose.

The next question, then, is when did the relationship end.  Kestenbaum argues that services on the Second ARA ended when it was executed in July 2017, and that he was no longer acting as counsel when Spadea attorneys took over in late 2020.  Plaintiff says it ended when it terminated the attorney-client relationship with Spadea in 2021.  The merger between Kestenbaum PC and Spadea occurred

in May 2019.  (ECF No. 62, PageID.1104).  Plaintiff named Spadea in this lawsuit, but the firm was dismissed.

In the view of the undersigned, the statute of limitations began to run when Kestenbaum ceased doing work for Plaintiff, not when the Spadea law firm no longer had Plaintiff as a client, because the issues here are about Kestenbaum's work.  He took part in emails during December 2020 giving his opinion about whether Plaintiff could terminate the Second ARA.  Spadea attorney Matson told Plaintiff's representatives that Kestenbaum would no longer be working on Plaintiff's matters on February 1, 2021.  (ECF No. 62-35, PageID.3497).  Kestenbaum no longer appears on emails after December 2020.  Whether the end point is December 2020 or February 2021, Plaintiff's July 2021 lawsuit is timely filed.

### 4.    Negligent Misrepresentation

Defendants assert, under New York law, that where claims of breach of negligence, breach of fiduciary duty, or negligent misrepresentation hinge on the same facts and seek the same relief, those claims are duplicative and must be dismissed.  (ECF No. 62, PageID.1120).  They therefore argue that Plaintiff's negligent misrepresentation claim, which is based on the same facts and seeks the same relief as the legal malpractice claim, should be dismissed as duplicative of the malpractice claim.  (*Id.*).  In response, Plaintiff did not directly address the

argument that the claim is duplicative of the legal malpractice claim.  Instead, it argued that there is a question of material fact on the negligent misrepresentation claim that precludes summary judgment.  It points to Lonny Morganroth's testimony about telling Kestenbaum he did not read well and needed to talk about the agreements, and that he trusted Kestenbaum to represent his intent and best interests in negotiation.  (ECF No. 64, PageID.3981).  Despite Morganroth's expectation, Plaintiff asserts that Kestenbaum's oral representations that the Second ARA reflected Plaintiff's requirements were false and negligent misrepresentations.  (*Id.*).

The undersigned finds that the negligent misrepresentation claim is duplicative of malpractice and should be dismissed.  Michigan courts look at the basis of the plaintiff's complaint to determine the type of action alleged.  *See Aldred v. O'Hara-Bruce*, 458 N.W.2d 671, 672-73 (Mich. Ct. App. 1990) (citation omitted) ("The gravamen of an action is determined by reading the claim as a whole.").  Claims against an attorney based on inadequate representation are malpractice claims.  *Id.*; *see also Broz v. Plante & Moran, PLLC*, 928 N.W.2d 292, 306 (Mich. Ct. App. 2018) ("a claim arising out of the fiduciary relationship between a professional and the professional's client alleging that the professional failed to adequately provide professional services sounds in malpractice, regardless of the label given to the claim."); *vacated on other grounds*, 928 N.W.2d 698

(Mich. 2019).  As in *Aldred*, the complaint shows that Defendants were retained to exercise appropriate legal skill in providing legal representation.  Even Plaintiff's negligent representation claim alleges that "Defendants owed Black Rock a duty of care by virtue of their fiduciary relationship as legal counsel to Black Rock."  (ECF No. 7, PageID.138-39, ¶ 79).  This points to a malpractice claim.  And negligent misrepresentation claims require a showing like professional malpractice: "A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care."  *Alfieri v. Bertolli*, 813 N.W.2d 772, 775 (Mich. Ct. App. 2012) (citation omitted).  Finally, in *Broz*, the Michigan Court of Appeals affirmed the dismissal of the negligent misrepresentation, breach of fiduciary duty, and estoppel claims as redundant to the professional malpractice claim.  928 N.W.2d at 306.  Thus, the negligent misrepresentation claim should be dismissed as a matter of law.

## IV.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that Defendants' motion for summary judgment (ECF No. 62) be **GRANTED IN PART AND DENIED IN PART**, and the negligent misrepresentation claim should be dismissed.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Loc. 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 2, 2024.

s/Curtis Ivy, Jr.
Curtis Ivy, Jr.
United States Magistrate Judge