UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SIZZLING BLACK ROCK STEAK
HOUSE FRANCHISING, INC.,

                Plaintiff,

v.

HAROLD L. KESTENBAUM, PC,
and HAROLD L. KESTENBAUM

                Defendants.

_____/

Case No. 21-cv-11621

Sean F. Cox
United States District Court Judge

Curtis Ivy, Jr.
United States Magistrate Judge

**<u>OPINION AND ORDER</u>**
**<u>(1) ADOPTING MAGISTRATE JUDGE CURTIS IVY, JR.'S APRIL 2, 2024</u>**
**<u>REPORT AND RECOMMENDATION (ECF NO. 72);</u>**
**<u>(2) OVERRULING DEFENDANTS HAROLD L. KESTENBAUM, P.C. AND</u>**
**<u>HAROLD L. KESTENBAUM'S OBJECTIONS TO THE REPORT AND</u>**
**<u>RECOMMENDATION (ECF NO. 73); AND</u>**
**<u>(3) GRANTING IN PART AND DENYING IN PART DEFENDANTS'</u>**
**<u>MOTION FOR SUMMARY JUDGMENT (ECF NO. 62)</u>**

On April 2, 2024, Magistrate Judge Curtis Ivy, Jr. issued a Report and

Recommendation to Grant in Part and Deny in Part Defendants Harold L.

Kestenbaum, P.C. and Harold L. Kestenbaum's Motion for Summary Judgment.

(ECF No. 72, Report and Recommendation.) Defendants Harold L. Kestenbaum,

P.C. and Harold L. Kestenbaum timely filed Objections to the Report and

Recommendation. (ECF No. 73, Defs. Obj.) Plaintiff Sizzling Black Rock Steak

House Franchising, Inc. filed a Response in opposition to Defendants' Objection.

(ECF No. 74, Pl. Resp.) Because the Court does not believe that oral argument will aid in its disposition of this matter, it will resolve this matter on the briefs in accordance with Eastern District of Michigan Local Rule 7.1(f)(2).

The Court, having conducted *de novo* review under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) of those portions of the April 2, 2024 Report and Recommendation to which specific and timely objections have been filed, OVERRULES Defendants' Objections, ADOPTS the April 2, 2024 Report and Recommendation to grant in part and deny in part Defendants' Motion for Summary Judgment, and GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Plaintiff Sizzling Black Rock Steak House Franchising, Inc. (Black Rock) is a Michigan corporation that franchises restaurants and licenses what it calls a "Restaurant Concept." (ECF No. 7, First Amended Complaint (FAC), ¶¶ 1-3.) Specifically, Black Rock owns, operates, and franchises restaurants and licenses the Restaurant Concept to area representatives for use in establishing restaurants in specific geographic areas pursuant to area representative agreements. (*Id.* ¶ 3.)

In 2013, Black Rock won first place in a contest called "America's Next Top Restaurant Franchise" (the Contest). (ECF No. 6-2, Declaration of Harold

Kestenbaum (Kestenbaum Decl.) ¶ 9, PageID.82.) The prize included free "initial legal services" from Defendant Harold Kestenbaum, who, at the time, ran a firm called Harold L. Kestenbaum, P.C. (HLK P.C.) based in Melville, New York. (*Id.* ¶¶ 4, 7, PageID.81-82.) Kestenbaum's legal practice focuses on franchise law, and he is licensed to practice in New York and New Jersey. (*Id.* ¶ 3, PageID.81-82) (ECF No. 7, FAC ¶ 5, PageID.123.) Kestenbaum states that he understood that, after he provided initial legal services at no cost to the Contest winner, that the company would hire him on a monthly retainer. (ECF No. 6-2, Kestenbaum Decl. ¶ 8, PageID.82.)

In 2014, Kestenbaum began providing free legal services to Black Rock, preparing Black Rock's franchise disclosure document and other initial documents over a four to six week period. (*Id.* ¶ 10, PageID.82.) During this initial time period, Kestenbaum worked with the Contest sponsor, Paul Samson, the president of Franchise Edge based in Florida, and had no direct contact with Black Rock or its principals. (*Id.* ¶ 11, PageID.83.)

Black Rock subsequently retained Kestenbaum as its legal counsel for all franchise matters, with a monthly retainer of $1,500 for legal services plus reimbursement of any costs Kestenbaum incurred on Black Rock's behalf. (ECF No. 7, FAC ¶¶ 16-17.) This monthly retainer increased to $2,000 per month beginning in August 2018. (*Id.* ¶ 18.)

3

### 1.    The First ARA

Starting in 2015, Black Rock sought to enter into area representative agreements (ARAs), which would grant area representatives (ARs) the exclusive right to open and operate, or to assist other franchisees in opening and operating, Black Rock Bar & Grill Restaurants in accord with the Restaurant Concept in a specific geographic area. (ECF No. 7, FAC ¶ 19.) Each ARA requires that the AR develop a certain number of restaurants in accord with deadlines set forth in the ARA's development schedule. (*Id.* ¶ 20.) These agreements typically provide for the AR to receive royalties based on gross sales generated by the restaurants they open or assist opening. "Evergreen" royalty provisions, sometimes contained in ARAs, require the franchising company to continue paying royalties to the AR after the ARA is terminated for failure to develop the agreed number of restaurants, so long as the AR performs their contractual duties on the restaurants they opened. Evergreen royalty provisions are the focal point of this lawsuit.

On May 18, 2015, Black Rock executed an ARA with BR Restaurants Holding Company, LLC (the "First ARA"). Article 12 of the First ARA lays out the "obligations upon termination or expiration" of the agreement. (ECF No. 62-6, First ARA, PageID.1232.) Article 12.1(i) of the First ARA states that if the AR fails to fulfill the obligations to develop the required number of restaurants (a failure to adhere to the "development schedule"), Black Rock will allow the AR to continue

4

operating all opened restaurants and will allow the AR to keep receiving royalties from those restaurants. (*Id*. at § 12.1(i), PageID.1233.) This is an evergreen royalties provision. However, in the very next subjection, Article 12.1(j), the ARA says that the AR "shall immediately and permanently forfeit all rights to earn any portion of . . . royalty fees . . . after termination of this Agreement." (*Id*. at § 12.1(j), PageID.1233.) Paul Samson, an owner of BR Holding Company, LLC, testified that the holding company and Black Rock specifically addressed or negotiated the evergreen royalty provision in the First ARA. (ECF No. 62-15, Samson Dep. at pp. 18, 41-43, PageID.2425, 2448-50.) Kestenbaum, on the other hand, testified that Article 12.1(j) of the First ARA cuts off evergreen royalties in the event of a termination. (ECF No. 62-13, Kestenbaum Dep. at p. 90, PageID.2237.)

On April 30, 2018, Kestenbaum sent the AR, BR Holding Company, a default and notice to cure, outlining several breaches of the First ARA. (ECF No. 62-17, Default and Notice to Cure First ARA, PageID.2693-97.) On May 31, 2018, Kestenbaum gave notice to the holding company that the First ARA was terminated for cause effective that day. (ECF No. 62-18, First ARA Termination Email, PageID.2699.) Damages are not claimed under the First ARA.

## 2.     The Second ARA

In March 2017, a little less than two years after the First ARA was executed, Kestenbaum prepared a second ARA ("the Second ARA") for Black Rock, this time between Black Rock and area representative Black Rock Midwest LLC (BRM LLC). (ECF No. 62-19, March 21, 2017 draft ARA, PageID.2700.) This Second ARA went through a number of negotiations, drafts, and edits by both parties over the months before it was signed in June 2017.

The first version of the Second ARA prepared by Kestenbaum on March 21, 2017 (emailed to Black Rock's representatives Jacob Schifko and Branden Morganroth) contained the same two contradictory Articles as the First ARA – one giving evergreen royalties if the agreement terminates because of failure to meet the development schedule (Article 12.1(i)), and the next terminating all royalties if the agreement is terminated (Article 12.1(j)). (*Id.* PageID.2730.) The parties negotiated and exchanged several more drafts of the Second ARA.

On March 31, 2017, Branden Morganroth, copying Schifko, sent redlined comments on the Second draft ARA back to Kestenbaum. (ECF No. 62-21, March 31, 2017 email, PageID.2758.) A suggested addition to Article 12.1(i) (the evergreen royalties provision) states that if the AR "[d]oes not complete development schedule they can not continue to sell in the area but will continue to support the sold, operating, or executed agreements. In the event they default, at no point can they sell

the development area – they must forfeit to us." (ECF No. 62-21, March 31, 2017 draft ARA, PageID.2788.) Morganroth also suggested a change to Article 12(j) to include a line stating that royalties will be terminated on termination of the agreement if the AR "does not open a minimum number of stores [illegible] are automatically forfeited to us." (*Id*. at PageID.2789.) These proposed revisions would terminate royalties if the Second ARA is terminated.

In response, Kestenbaum made some changes to the proposed Second ARA and sent it to Schifko and Branden Morganroth on May 22, 2017. (ECF No. 62-22, May 22, 2017 email, PageID.2816.) In this version, Article 12.1(i) reads:

> You shall immediately and permanently forfeit all rights to earn any portion of additional initial franchise fees, royalty fees and/or transfer fees paid to us by franchisees in the Development Area; <u>for any new franchises</u> ~~limited to franchises we didn't develop~~ <u>but not with regard to existing Restaurants we developed</u> ~~so we continue to receive royalties and rebates~~ after the termination of this Agreement[.]

(*Id.* PageID.2846 (underline and strikethrough in original).) Article 12.1(j) reads that upon termination of the ARA for any default, the AR will be required to pay liquidated damages. (*Id.*) This provision is materially different from 12.1(j) in previous drafts and from 12.1(j) in the First ARA. (*Id.*). In addition, Article 11.4 of this May 22, 2017 draft ARA states that failure to meet the development schedule is a default giving Plaintiff the right to terminate the agreement. However, if the AR is otherwise in compliance with the agreement, Plaintiff would not have the right to

terminate the agreement and the AR could continue to service the opened restaurants. The AR would continue receiving royalties in that circumstance. (*Id*. PageID.2844)

In other discussions about the Second ARA, Plaintiff Black Rock's president, Lonny Morganroth, testified that he spoke with Kestenbaum about evergreen royalties and testified that he told Kestenbaum that the only way Black Rock would allow evergreen royalties is if the AR "seeded" (opened) ten restaurants. (ECF No. 62-10, L. Morganroth Dep. at pp. 31, 93, 148, PageID.1473, 1535, 1590.)

The parties continued to negotiate the terms of the draft Second ARA during May and June 2017, including negotiating Article 11.4, the termination upon default provision, 12(i), the royalties provision, and 12(j). The parties discussed and negotiated when or if a termination of the ARA would cut off royalty payments to the AR, and for which locations. (*See* ECF Nos. 62-23 through 62-32, emails and drafts; ECF NO. 64-13, emails.)

Brandon Morganroth signed the final version of the Second ARA on June 21, 2017. (ECF No. 62-7, Second ARA.) The Second ARA required the AR to open at least 10 restaurants by the end of 2020. (*Id.* PageID.1325.) This final version contained evergreen royalty provisions in Articles 11.4 and 12.1(i). (*Id.* PageID.1294-96.) In addition, Article 2.1 provides that that "the terms of this Agreement shall continue to remain in effect, unless otherwise terminated as set

8

forth in this Agreement, excluding a Partial Termination as defined below. You and us acknowledge that this Agreement shall be 'Evergreen.'") (*Id.* PageID.1276.)

### 3. Amendment and Termination of the Second ARA

In October 2019, Black Rock and the AR agreed to formally amend the Second ARA so that the AR would have to open five restaurants instead of ten by the end of 2020. (ECF No. 62-33, Emails and Amendment, PageID.3491, 3493.) However, by the end of 2020, it became clear that the AR would not meet this amended requirement, and Black Rock began contemplating terminating the ARA. (ECF No. 7, FAC, ¶ 49.)

On December 20, 2020, Jacob Schifko, on behalf of Black Rock, emailed Kestenbaum stating that it was their intent that if the agreement was terminated for any reason before the AR opened ten restaurants, the AR would lose all compensation including royalties. (ECF No. 62-34, Email, PageID.3494). Schifko stated that "[a]fter review there seems to be some contradictions throughout [the Second ARA]." (*Id.*) In response, Kestenbaum wrote that the Second ARA provides that termination before ten restaurants would result in termination of rebates but not royalties. (*Id.*).

On December 21, 2020, Kestenbaum explained to Schifko that royalties would be due for existing restaurants if the agreement was terminated only for failure to open restaurants, but no royalties would be due if the Second ARA was terminated

for cause under Article 5. (ECF No. 64-6, Emails, PageID.4308.) In response, Schifko claimed that Kestenbaum made a mistake in the Second ARA in Article 12.1(j). He accused Kestenbaum of being reckless by not paying attention and not making sure the documents matched Black Rock's intent. (*Id*. PageID.4307.)

The next day, Kestenbaum sent another email. (ECF No. 64-7, Email, PageID.4310.) This time, Kestenbaum stated that Article 5.13 of the Second ARA is a "catch all" provision that says failure to comply with all "other requirements" in the agreement results in default, which under Article 5 is a complete termination. (*Id.*) He stated that the development schedule "would be considered as an 'other requirement' in the agreement" so that if Black Rock terminated under Article 5 for failure to meet the development schedule, it would not have to pay royalties on existing restaurants. (*Id.*) This appears to be the last interaction Kestenbaum had with Plaintiff Black Rock. Attorney Andrew Matson took over for Kestenbaum with respect to Black Rock's business after the merger of Kestenbaum P.C. and Spadea Lignana, LLC on February 1, 2021. (ECF No. 62-35, Emails, PageID.3497.)

On February 4, 2021, Branden Morganroth emailed Matson to say that they were considering terminating the Second ARA because the AR did not adhere to the development schedule. (ECF No. 62-36, Email, PageID.3499-50.) Matson emailed Schifko on February 9, 2021, stating that terminating the Second ARA for the AR's failure to open the requisite number of restaurants would not result in full

termination of the agreement and that royalties therefore would be due on existing restaurants. (ECF No. 64-8, Email, PageID.4312.)

Black Rock was aware prior to terminating the Second ARA that the AR was not performing all of its contractual obligations under the Second ARA, such as inspecting each restaurant monthly, disregarding brand standards to have a frozen Coke machine in each restaurant, and failing to use local advertising methods. And Black Rock's representatives acknowledged that the attorneys (Kestenbaum and/or Matson) told them they could terminate the agreement in full for these failures, including terminating all royalties, if the issues were not cured within 30 days. (ECF No. 62-10, Lonny Morganroth Dep. at pp. 47, 198, 215-16, PageID.1489, 1640, 1657-58) (ECF No. 62-11, Branden Morganroth Dep. at pp. 27-28, 46, 114, PageID.1742-43, 1761, 1829) (ECF No. 62-12, Jacob Schifko Dep. at pp. 114, 138-39, 179, PageID.1994, 2018-19, 2059.) Black Rock's representative Lonny Morganroth stated that Black Rock did not send a termination letter upon learning of the deficiencies because it first wanted to give the AR "a common courtesy" and opportunity to cure. (ECF No. 62-10, Lonny Morganroth Dep. at p. 198, PageID.1640.)

In early March 2021, Schifko and Matson exchanged emails discussing Black Rock's options. (ECF No. 64-11, Emails, PageID.4427-30.) Schifko asked if Black Rock could do a full termination of the agreement because of the AR's failure to do

11

monthly inspections of existing restaurants. (*Id.* PageID.4428-29.) He also acknowledged that the AR could not cure that deficiency because they could not go back in time to inspect restaurants. (*Id.*) Matson responded that if the AR was aware of their obligations, Black Rock could argue that the Second ARA should be terminated, and he agreed that the AR cannot cure the past failure to inspect. (*Id.* PageID.4427-28.) However, Matson had earlier advised in February 2021 that he did not think the Second ARA should be fully terminated because it could end up with a "fight" that would be costly. (*Id*. PageID.4429 (advising not to send a termination letter "unless you want to have a fight that will cost $$ and have unknown outcome").) Matson again suggested in March 2021 a partial termination for failure to meet the development schedule to keep the business relationship with the AR. (*Id*. PageID.4427.) Eight minutes after that email, Schifko said they decided to do a partial termination. (*Id*.)

On March 12, 2021, Black Rock, through its corporate counsel Lawrence Flaggman, sent a letter to the AR partially terminating the Second ARA for failure to meet the development schedule and collecting liquidated damages. (ECF No. 62-37, Letter, PageID.3501-02.) Black Rock continues to pay royalties to the AR for the existing restaurants.

### 4. Third and Fourth ARAs

Plaintiff and BR Holding II, LLC, executed an ARA on June 21, 2018 (the Third ARA). (ECF No. 62-8, Third ARA.) This Third ARA, prepared by Kestenbaum, had roughly the same evergreen royalty provisions as the Second ARA. (*Id.* PageID.1358.) This agreement was mutually terminated on June 19, 2020, and Plaintiff is not paying evergreen royalties on this ARA. (ECF No. 62-38, Termination Agreement.)

Plaintiff and Third Bite of the Apple, LLC entered into a Fourth ARA on July 6, 2020. (ECF No. 62-9, Fourth ARA.) This ARA contained the same evergreen royalty provisions as the Second and Third ARAs. (*Id.* PageID.1413.) This agreement appears to still be in effect.

### B. Procedural History

On June 10, 2021, Plaintiff Black Rock filed this legal malpractice action against Defendants Harold L. Kestenbaum, Harold L. Kestenbaum P.C., and Spadea Lignana, LLC in the Oakland County Circuit Court. (ECF No. 1-1, Compl.) Defendants removed this action to this Court on July 14, 2021, based on diversity jurisdiction. (ECF No. 1, Notice of Removal.)

On July 22, 2021, Black Rock refiled its Complaint pursuant to the Court's prior Order to refile the state court complaint in accordance with the Eastern District of Michigan Local Rules. (ECF No. 7, FAC.) Black Rock alleges that Defendants

negligently prepared the Second, Third and Fourth ARAs to include a provision for Evergreen Royalties in direct contravention to Black Rock's instruction and asserts claims for: (1) Professional Negligence by all Defendants; (2) Negligent Misrepresentation against all Defendants; and (3) Negligent Supervision against Defendant Spadea. (*Id.*)

On July 21, 2021, Defendants filed a Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). (ECF No. 6, Defs.' Mot.) On December 17, 2021, the Court entered an Opinion and Order granting in part and denying in part Defendants' motion to dismiss. (ECF No. 12, Opinion and Order.) Specifically, the Court granted the motion to dismiss as to Defendant Spadea because it did not have specific personal jurisdiction over that Defendant. But the Court denied the motion to dismiss as to Defendants Kestenbaum and HLK PC, holding that the Court has specific personal jurisdiction as to these Defendants. (*Id.*)

There are now two remaining claims against Defendants Kestenbaum and HLK P.C. in this case: (1) Count I – Professional Negligence, and (2) Count II – Negligent Misrepresentation. (ECF No. 7, FAC.)

Defendants moved for summary judgment on September 29, 2023. (ECF No. 62.) Black Rock filed a Response in opposition (ECF No. 64), and Defendants filed a Reply brief. (ECF No. 65.)

14

On October 13, 2023, this matter was referred to Magistrate Judge Curtis Ivy, Jr. for all pretrial proceedings. (ECF No. 63.) Magistrate Judge Ivy held a hearing on Defendants' motion for summary judgment on March 28, 2024.

On April 2, 2024, Magistrate Judge Ivy issued a Report and Recommendation (R&R) recommending that Defendants' motion for summary judgment be granted in part and denied in part. (ECF No. 72, R&R.) The R&R determined that Michigan law applied to all claims in this action, including the applicable statute of limitations for Black Rock's legal malpractice claim. The R&R further recommended that Black Rock's legal malpractice claim is not barred by limitations and that genuine issues of material fact bearing on the merits of that claim exist, precluding summary judgment. Finally, the R&R determined that Black Rock's negligent misrepresentation claim is duplicative of its legal malpractice claim and thus should be dismissed.

Defendants filed timely objections to the Magistrate Judge's R&R, to the extent it recommends denying Defendants' motion for summary judgment. (ECF No. 73.) Black Rock filed a timely Response in opposition to Defendants' objections. (ECF No. 74.)

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1), the Court conducts a *de novo* review of the portions of the Magistrate Judge's Report

and Recommendation to which a party has filed "specific written objection" in a timely manner. *Lyons v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 659, 661 (E.D. Mich. 2004) (citing Fed. R. Civ. P. 72(b)). A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Only those objections that are specific are entitled to a *de novo* review under the statute. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). "The parties have the duty to pinpoint those portions of the magistrate[ judge]'s report that the district court must specially consider." *Id*. (quotation marks and citation omitted). "A general objection, or one that merely restates the arguments previously presented is not sufficient to alert the court to alleged errors on the part of the magistrate judge." *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004). "'[B]are disagreement with the conclusions reached by the Magistrate Judge, without any effort to identify any specific errors in the Magistrate Judge's analysis that, if corrected, might warrant a different outcome, is tantamount to an outright failure to lodge objections to the R & R.'" *Arroyo v. Comm'r of Soc. Sec.*, No. 14-cv-14358, 2016 WL 424939, at *3 (E.D. Mich. Feb. 4, 2016) (quoting *Depweg v. Comm'r of Soc. Sec.*, No. 14-11705, 2015 WL 5014361, at *1 (E.D. Mich. Aug. 24, 2015) (citing *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)).

16

Finally, parties cannot raise arguments on objection or appeal that they did not bring before the Magistrate Judge. *Murr v. United States,* 200 F.3d 895, 901 n. 1 (6th Cir. 2000).

## III.    ANALYSIS

Defendants filed six objections to Magistrate Judge Ivy's Report and Recommendation.

### A. Objection No. 1: Whether New York Law Should Apply to This Action

Defendants object to the Magistrate Judge's recommendation that Michigan law applies to this action and argue that New York law applies instead. This objection will be overruled.

As the Magistrate Judge correctly stated, to determine the source of law applicable in this federal diversity jurisdiction case, the Court applies the choice of law principles in the forum state, in this instance, Michigan. *Tele-Save Merch. Co. v. Consumers Distrib. Co.*, 814 F.2d 1120, 1122 (6th Cir. 1987) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Defendants do not argue otherwise. Defendants further agree that under applicable Michigan choice-of-law rules, the Court applies Michigan law unless a "rational reason" to do otherwise exists. *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 286 (1997); *Burney v. PV Holding Corp.*, 218 Mich. App. 167, 172 (1996) (stating that Michigan applies the lex fori rule to legal malpractice claims, which provides that "the law of

17

the forum state (lex fori) should apply unless there is a 'rational reason' to displace it."). "In determining whether a rational reason to displace Michigan law exists," the Michigan Supreme Court explains, "we undertake a two-step analysis. First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Sutherland*, 454 Mich. at 286. While this analysis "most frequently favors the forum (Michigan's) law, Michigan courts nonetheless use another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter." *Hall v. Gen. Motors Corp.*, 229 Mich. App. 580, 582 (1998).

The Magistrate Judge applied Michigan's choice of law rules and recommended that Michigan has the greater interest, or at least more than a minimal interest, in having its law applied because:

> Plaintiff is a Michigan-chartered corporation headquartered in Michigan and primarily conducting business in Michigan…. Plaintiff and Kestenbaum's business relationship continued for seven years during which Kestenbaum prepared ARAs, negotiated and prepared franchise-related documents, and filed franchise documents with the state of Michigan. Moreover, expanding a Michigan franchise concerns Michigan interests. Michigan has an interest in the health and growth of its corporations, as well as the financial stability and employment

potential of those corporations. This is so even though Black Rock has restaurants outside of Michigan.

(ECF No. 72, R&R, PageID.4609-10 (internal record citation omitted).) The Magistrate Judge further stated that Defendants concede that Michigan and New York legal malpractice laws are similar, and thus there is no actual conflict. (*Id.*)

Defendants do not challenge the Magistrate Judge's findings of their connections to Michigan and their business dealings with Michigan residents, and thus do not dispute Michigan's interest in the legal services provided to a Michigan entity. Defendants instead argue in their Objection that this Court should find that New York law nevertheless should apply because this is a legal malpractice action against a New York attorney, and that New York has a substantial interest in determining whether its admitted attorneys properly performed legal services or deviated from the applicable standard of care.

Notably, Defendants do not dispute that there is no actual conflict between Michigan and New York legal malpractice law. The Court finds that this is dispositive of the choice of law analysis. This is because before undertaking a choice-of-law analysis, the Court must first determine whether an actual conflict exists between the substantive laws of Michigan and New York. Only if an actual conflict exists must the Court proceed to determine which state has a materially greater interest in having its laws applied. *See CenTram Inc. v. Estrin*, 538 F.3d 402,

409 (6th Cir. 2008) (stating the court "need not resolve the exact question of what Michigan's choice-of-law principles would indicate as the applicable standards for professional conduct because … Michigan's standards of professional conduct are consistent with the other possible sources of law, making any asserted conflict of laws a false conflict.") (citing *Williams v. Toys "R" US*, 138 F. App'x 798, 803 (6th Cir. 2005) ("Because there is no conflict of laws (indeed this is a false conflict situation), we therefore conclude that the district court did not err in applying Michigan state law in this case."). "A choice of law analysis is unnecessary where there is no actual conflict because '[t]here can be no injury] in applying a particular state's law absent a true conflict." *French v. Essentially Yours Indus., Inc.*, No. 1:07-CV-817, 2008 WL 2788511, at *6 (W.D. Mich. July 16, 2008) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985)). Because no identified conflict exists between Michigan and New York law with respect to Black Rock's legal malpractice claim exists, a choice of law analysis is unnecessary, and the Court finds that the Magistrate Judge did not err in applying Michigan law.

The Magistrate Judge recognizes that Michigan and New York differ in the statute of limitations for legal malpractice claims. Under Michigan law, the period of limitations is two years for malpractice claims, Mich. Comp. Laws 600.5805(8), while the limitations for legal malpractice actions in New York is three years. N.Y. CPLR § 214(6). Nevertheless, "[u]nder Michigan's common law choice of law rule,

20

statutes of limitations are considered procedural and are governed by the law of the forum." *Czewski v. KVH Indus., Inc.*, 607 F. App'x 478, 480 (6th Cir. 2015) (quoting *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 746 (6th Cir. 1999)).

Finally, Defendants' argument that Black Rock conceded that New York law should apply because its legal malpractice expert, Michael Garner, is licensed in New York similarly fails. Defendants failed to adequately make this argument before the Magistrate Judge, and  they cannot raise arguments on objection or appeal that they did not bring before the Magistrate Judge. *Murr*, 200 F.3d at 901 n. 1. In their motion for summary judgment, Defendants asserted only "[n]otably, Expert Garner admits he is not licensed to practice law in Michigan and testified he couldn't offer an opinion on Michigan law." (ECF No. 62, Defs. Mot., PageID.1110.) Courts routinely decline to consider such perfunctory, undeveloped arguments of the kind made by Defendants. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)). Defendants' failure to adequately raise this argument prior to this Objection means Defendants have waived this argument. *See Childress v. Michalke*, No. 10-CV-11008, 2014 WL 3819347, at *3 (E.D. Mich. Aug. 4, 2014) ("It is well established that a party may not raise an argument, advance a theory, or marshal evidence before a district judge that was not fairly presented to the magistrate judge. The Magistrates

Act was not intended to give litigants an opportunity to run one version of their case past the magistrate, then another past the district court.").

Moreover, to the extent Defendants' "skeletal argument" could suffice, it would fail. Garner has stated that he is not offering an opinion on Michigan law but instead on whether Kestenbaum's conduct at issue was "in accordance with the standard of care applicable to and employed by ordinary attorneys in the State of New York *and attorneys practicing in the field of franchise law*." (ECF No. 62-40, Garner Expert Report, PageID.3512 (emphasis added)) (ECF No. 62-41, Garner Dep. at pp. 49-50, PageID.3586-87.) Defendants have not challenged Garner's qualifications to opine on whether Kestenbaum's conduct was below the standard of care of an expert franchise attorney, and the time for doing so has passed. And in any event Defendants have not presented any evidence that the standard of care for a franchise attorney in New York is any different than that for an attorney in Michigan.

Accordingly, Defendants' Objection No. 1 is overruled.

**B. Objection No. 2: Whether There Are Disputed Issues of Material Fact as to Whether Defendants' Actions Proximately Caused Plaintiff's Damages**

To establish a legal malpractice claim in Michigan, a plaintiff must demonstrate: (1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was the proximate

cause of an injury; and (4) the fact and extent of the injury alleged. *Simko v. Blake*, 448 Mich. 648, 655 (1995) (citations omitted). The Magistrate Judge found that the first element of Black Rock's legal malpractice claim is uncontested, and that there are genuine issues of material fact as to the second, third and fourth elements of that claim.

Defendants object to the Magistrate Judge's finding that there is a genuine issue of material fact as to the third element: whether Defendants' actions were the proximate cause of Black Rock's claimed injury – having to pay evergreen royalties under the Second ARA. To establish proximate cause in this case, Black Rock must prove that the Defendants' negligence was both the cause in fact and legal cause of the injuries. *Weymers v. Khera*, 454 Mich. 639, 647 (1997). Cause in fact requires Black Rock to "present substantial evidence from which a jury may conclude that more likely than not, but for [Defendants'] conduct, [Black Rock's] injuries would not have occurred. *Id.* at 647-48 (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 164-65 (1994)). "To establish legal cause, [Black Rock] must show that it was foreseeable that [Defendants'] conduct 'may create a risk of harm to the victim, and … [that] the result of that conduct and the intervening causes were foreseeable.'" *Id.* (quoting *Moning v. Alfono*, 400 Mich. 425, 439 (1977)).

In their Objection, Defendants list six "undisputed" facts that they contend show that Black Rock could have terminated the Second ARA because of the AR's

multiple Article 5 violations, which would have eliminated all evergreen royalties, but that Black Rock instead chose to partially terminate the Second ARA and collect $460,000.00 in liquidated damages. Defendants argue therefore that Black Rock cannot show that "but for" the Defendants' actions it was forced to pay evergreen royalties under the Second ARA.

First, Defendants do not provide any record citations in support of their asserted list of "undisputed" facts. Second, as the Magistrate Judge found, Black Rock has presented record evidence that its representatives consulted with Defendants about the AR's failure to meet some of its obligations, such as inspecting the restaurants every month, and that while Spadea attorney Matson agreed that this failure would allow Black Rock to fully terminate the agreement, he earlier advised not sending a termination letter "unless you want to have a fight that will cost $$ and have unknown outcomes." (ECF No. 64-11, Emails, PageID.4429.) Matson later suggested negotiating a deal to avoid terminating the Second ARA to keep the relationship going. (*Id.* PageID.4427.) Eight minutes after that recommendation, Black Rock elected to partially terminate the ARA. (ECF No. 64-11, Emails, PageID.4429.) In addition, Black Rock representatives Lonny Morganroth and Jacob Schifko testified that they understood that Matson had earlier recommended a partial termination of the Second ARA. (ECF No. 62-10, Lonny Morganroth Dep. at pp. 225-26, PageID.1667-68) (ECF No. 62-12, Schifko Dep. at pp. 221-22,

PageID.2101-02.) Black Rock also provided evidence that it had not notified the AR of certain Article 5 defaults, and thus had not given the AR notice and an opportunity to cure as required under the ARA, (ECF No. 64-11, Emails, PageID.4429), and evidence that the AR disputed that it had in fact violated Article 5. (*Id.* PageID.4428.) In addition, Kestenbaum had advised Black Rock that failure to meet the development schedule could constitute an Article 5 default (ECF No. 64-7, Email, PageID.4310) and Matson later advised the opposite – that failure to meet the development schedule would not constitute an Article 5 default. (ECF No. 64-8, Email, PageID.4312.)

The Court agrees with the Magistrate Judge, considering this record evidence in the light most favorable to Black Rock, that issues of material fact remain for the jury to decide with respect to Black Rock's legal malpractice claim, including how to interpret Article 5 of the Second ARA, whether Defendants advised Black Rock to fully or partially terminate the Second ARA, and whether Black Rock could terminate the Second ARA for failure to meet the development schedule, inspect restaurants, or other obligations, and thus whether Defendants' actions were the proximate cause of Black Rock's claimed injury – the payment of evergreen royalties under the Second ARA.

Accordingly, Defendants' Second Objection is overruled.

25

### C. Objection No. 3: Whether the First ARA is Relevant to Black Rock's Allegations Concerning the Second ARA

Defendants object to the Magistrate Judge's recommendation that "the First ARA does not have evergreen royalties, or at least there is a question of fact" as to whether it does and disagree that the terms of the First ARA have any bearing on Black Rock's understanding of the Second ARA. Defendants argue that Black Rock's representatives were "intimately involved" in the drafting, preparation, and negotiation of the Second ARA and thus the First ARA, and whether or not it had evergreen royalties, is not relevant here.

Defendants' objection is without merit. The Report and Recommendation states, with respect to the First ARA, that "[s]ubsection 12.1(i) has an evergreen royalties provision. But the next subsection [12.1(j)] says the AR forfeits rights to royalty fees after termination of the agreement, without condition or modification. Kestenbaum confirmed that Section 12.1([j]) cuts off evergreen royalties in the event of a termination." (ECF No. 72, R&R, PageID.4614 (internal record citations omitted).) These facts are undisputed.[1] The Magistrate Judge noted that the first draft

---

[1] The Court notes that Defendants mischaracterize Kestenbaum's testimony in their Objection. Defendants quote only Kestenbaum's testimony regarding Article 12(i) of the First ARA, which he interprets to include evergreen royalties, but ignore Kestenbaum's immediately following testimony that Article 12(j) of the First ARA cuts off all royalties upon termination of the ARA. (ECF No. 62-13, Kestenbaum Dep. at p. 90, PageID.2237.)

of the Second ARA contained these same two contradictory provisions. (*Id.* PageID.4595-96.) This is also undisputed. (ECF No. 62-19, Email with draft Second ARA, PageID.2730.) The Report and Recommendation noted the existence of these contradictory terms within both ARAs "[t]o illustrate the confusing nature of the ARAs[.]" ((ECF No. 72, R&R, PageID.4614.)

The Court finds that the Magistrate Judge did not give these facts undue weight, but instead considered all the facts in the light most favorable to Black Rock and found that these facts supported the existence of a disputed issue of material fact as to whether Kestenbaum used reasonable care and skill in drafting the Second ARA to satisfy Black Rock's stated intentions not to include an unbounded evergreen provision in that ARA.

Accordingly, Defendants' Third Objection is overruled.

**D. Objection No. 4: Whether is it Undisputed That Black Rock Was Aware of and Agreed to Evergreen Royalties in the Second ARA**

Defendants object to the Magistrate Judge's recommendations that "[t]here are questions of material fact relating to whether Kestenbaum used reasonable care and skill to draft the ARAs that satisfied Plaintiff's intentions and legally accomplished objections" and that "[t]he facts here do not suggest that the client affirmatively approved of the inclusion of the evergreen royalties provision as written as part of the negotiation with the AR." (ECF No. 73, Defs. Obj.,

PageID.4652, citing ECF No. 72, R&R, PageID.4612-18.) Defendants contend that record evidence demonstrates that Black Rock's representatives expressly acknowledged evergreen royalties in the Second ARA as they negotiated, reviewed, and commented on at least nine drafts of the Second ARA, all containing evergreen royalty provisions. Defendants disagree with the Magistrate Judge's finding that the parties' comments and notations on the documents themselves raise a question of fact as to whether the Second ARA comported with Black Rock's expectations and understanding. Defendants contend that notations indicate that the issue of evergreen royalties had been resolved.

Black Rock responds that the evidence, viewed in the light most favorable to it, demonstrates that it did not agree to nor approve of the inclusion of evergreen royalties in the Second ARA "without a minimum store requirement" and thus the Magistrate Judge properly found a disputed issue of material fact exists. Black Rock cites to Lonny Morganroth testimony that he instructed Kestenbaum (1) that "we would allow … those royalties … as long as [the AR] seeded ten stores, and we wouldn't do it any other way"; (2) that he "made it very clear to Harold, very clear that it would have to be 10 stores or more, and I wouldn't settle for anything less"; (3) "I told Harold, Harold, they need to do ten stores or more. If they do ten stores or more, I will let them have them; otherwise, with under ten stores, nine or below, it needs to not be, you know, they don't get them;" (4) "[t]en or more stores they

would keep the royalties, providing they do their services. Nine or less stores they lose everything. That's what I told Harold"; and (5) "I told Harold if there are ten stores or more, okay, being they can have, royalties will continue. If there are nine stores or below they couldn't. That's where our conversation was, and that's where it finished. Harold understood it, and I also told Harold I wouldn't accept anything less." (ECF No. 62-10, Lonny Morganroth Dep. at pp. 31, 93, 147-49, PageID.1473, 1535, 1589-91.)

Black Rock representative Jacob Schifko similarly testified that: (1) "it was most certainly expressed to [Kestenbaum] in many different ways that [the AR is] supposed to lose all forms of revenue stream regardless of the termination … they had to his 10 [stores] before they could keep anything in any way, shape or form"; (2) Kestenbaum was told that the AR was "not supposed to keep any revenue stream for anything unless at some point … they reached 10 stores"; (3) "[i]t was never understood there would be Evergreen royalt[ies]"; and (4) "[w]e most certainly talked to Harold and asked him it [the Second ARA] said what it was supposed to say and he most certainly said yes." (ECF No. 62-12, Schifko Dep. at pp. 29-31,64, 75, PageID.1909-11, 2044, 2055.) Black Rock also contends that the documents exchanged during negotiations of the Second ARA themselves demonstrate its concerns regarding evergreen royalty payments

While Defendants would like this Court to ignore the deposition testimony cited above, and rely only on the evidence Defendants point to, this Court agrees with the Magistrate Judge that this record evidence, viewed in the light most favorable to Black Rock, creates a genuine issue of material fact as to whether Kestenbaum used reasonable care and skill to draft the Second ARA that satisfies Black Rock's objectives.

Further, there are questions of material fact regarding the meaning of notations and comments on the various drafts of the Second ARA. Brandon Morganroth wrote "TBD w/ 11.2" on a draft of the ARA at Article 12(i) of that draft ARA. (ECF No. 62-25, May 2017 Email with draft ARA, PageID.2908.) Article 11.2 addresses termination of the agreement for certain defaults. (*Id.* PageID.2905.) Kestenbaum responded in a separate subsequent draft ARA "This is OK" and crossed out the "TBD w/11.2" notation by Black Rock's representative. (ECF No. 64-13, June 2017 Email with draft ARA, PageID.4472.) Contrary to Defendants' interpretation of the "plain meaning" of these notations and comments, the meaning of those notations next to the evergreen royalties provision is not clear. This, coupled with the deposition testimony and Plaintiff's expert's unrebutted opinion that the Second ARA was drafted in a confusing manner such that a lay person could not read and understand the royalties issue, all creates a genuine issue of material fact as to

whether Kestenbaum exercised reasonable care in drafting the Second ARA to conform to Black Rock's expectations.

Defendants further argue that Black Rock's representatives are deemed to have understood the agreement they signed based on the contract principal that a party is presumed to have read the agreement he signed. Defendants made this same argument in their motion for summary judgment, and the Magistrate Judge found that it is unclear whether this presumption applies in the legal malpractice context as opposed to only between parties to a contract. (ECF No. 72, R&R, PageID.4617-18.) The Magistrate Judge reasoned that such a rule in the legal malpractice context "would effectively eliminate legal malpractice claims grounded in an attorney's drafting of a document for the client" because "the lawyer is legally obligated to draft documents using reasonable skill and care to meet the client's objectives and to support their best interests." (*Id.* (noting that "[t]his is not unlike cases in which clients challenge their counsel's work in divorce or settlement agreements.").) The Court agrees with the Magistrate Judge's reasoning. The Magistrate Judge further noted that Defendants have failed to point to any case law that absolves an attorney of negligence in drafting an agreement just because the client read and signed the agreement. (*Id.*) Defendants have similarly failed to point to any such case law in its Objection.

The Court finds, to the extent Defendants contend that Black Rock is contributorily or comparatively negligent for presumably not reading the Second ARA, that such an argument would not mandate summary judgment. In *Placek v. Sterling Heights*, 405 Mich. 638, 662 (1979), the Michigan Supreme Court adopted the pure form of comparative negligence, which provided that liability for damages in a negligence action be apportioned on the basis of the relative fault of the plaintiff and the defendant. Under this comparative-negligence scheme, a plaintiff whose negligence contributed to their injury may still recover against a negligent defendant, and the plaintiff's damages award is simply reduced to reflect the extent of the plaintiff's own fault. *Id.*; *see also Kandil-Elsayed v. F&E Oil, Inc.*, 512 Mich. 95, 118-19 (2023) (recognizing adoption of "modern scheme of comparative fault"). In *Pontiac School District v. Miller, Canfield, Paddock & Stone*, 221 Mich. App. 602, 626 (1997), the Michigan Court of Appeals held that "comparative negligence is a defense in a legal malpractice action unless as a matter of law the client had no obligation to act on the client's own behalf." The issue of comparative negligence is generally an issue that lies squarely in the province of the jury. As the Michigan Court of Appeals explained in *Pontiac School District*,

> "When deciding whether an instruction on comparative negligence is appropriate, the question is whether, in viewing the evidence most favorably to the defendant, there is sufficient evidence for the jury to find negligence on the part of the injured plaintiff.... Circumstantial evidence and permissible inferences therefrom may constitute

sufficient proof of negligence.... *The trend is to allow all issues, when supported by facts, to go to the jury.*"

*Id.* at 623 (emphasis added) (quoting *Duke v. American Olean Tile Co.*, 155 Mich. App. 555, 565-566 (1986)).

In reaching its holding, the court in *Pontiac School District* relied in part on *Becker v. Port Dock Four, Inc.*, 90 Or. App. 384, 390 (1988), which concluded that the comparative fault defense should be available in legal malpractice actions. *Pontiac Sch. Dist.*, 221 Mich. App. at 624-25. *Becker* is instructive here. In *Becker*, the plaintiffs sued their attorney for failing to include certain conditions in a deed, which they claimed deprived them of certain rights, causing damages. *Becker*, 90 Or. App. at 390-91. The Oregon Court of Appeals stated that the plaintiffs had not read the deed before signing it "and, as a possible result, neglected to call the lawyer's attention to the fact that he had omitted data which was very much within the plaintiff's knowledge." *Id.* (noting "[the plaintiffs were in as good a position as [the lawyer] to know that something was missing."). The court stated that it was for the jury to decide whether and to what extent plaintiffs were at fault for not reading the deed. *Id.*; *see also Kylin Network (Beijing) Movie & Culture Media Co. v. Fidlow*, No. 3:16CV999-HEH, 2017 WL 889620, at *3-4 (E.D. Va. Mar. 6, 2017) (holding it was for jury to decide whether plaintiff was contributorily negligent in legal malpractice action for entering into agreements without reading them).

Similarly, here, it is for the jury to decide whether and to what extent Black Rock is at fault to the extent its representatives did not read and/or understand the Second ARA and instead relied on Defendants' professional expertise.

Accordingly, Defendants' Objection No. 4 is overruled.

### E. Objection No. 5: Whether the R&R Correctly Determined that Black Rock's Legal Malpractice Claim is Not Time Barred[2]

Defendants object to the Magistrate Judge's determination that the statute of limitations on Black Rock's legal malpractice claim began to run when Kestenbaum ceased doing work for Black Rock in December 2020, and that Black Rock's July 2021 lawsuit therefore is timely filed. Defendants contend that Black Rock's legal malpractice claim accrued on June 21, 2017, the date of the execution of the Second ARA, and thus that it is time barred.

Under Michigan law, the statute of limitations for a legal malpractice claim "accrues at the time that person discontinues serving the plaintiff in a professional … capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim." Mich. Comp. Laws 600.5838(1); *see also Kloian v. Schwartz*, 272 Mich. App. 232, 237 (2006) (citing Mich. Comp. Laws 600.5805(1) and (6), 600.5838(1)). Thus, a legal malpractice claim in Michigan accrues when the lawyer stops serving the plaintiff

---

[2] The Court notes that Defendants label this as a second "Objection No. 4."

in a professional capacity on the matter giving rise to the claim. Mich. Comp. Laws 600.5838(1). A lawyer discontinues serving a client when relieved of the obligation by the client or the court, *Stroud v. Ward,* 169 Mich. App. 1, 6 (1988), or upon completion of a specific legal service that the lawyer was retained to perform. *Chapman v. Sullivan,* 161 Mich. App. 558, 561-562 (1987); *see also Maddox v. Burlingame*, 205 Mich. App. 446, 450 (1994) ("A lawyer discontinues serving a client ... upon completion of a specific legal service that the lawyer was retained to perform.").

The dispute here is when Defendants ceased providing legal services to Black Rock. The Magistrate Judge found that Defendants "provided generalized legal services to Plaintiff throughout the duration of the relationship, rather than providing discrete legal services." (ECF No. 72, R&R, PageID.4631.) The Magistrate Judge noted that Black Rock paid Defendants a monthly fee until May 2021, that their business relationship continued for seven years "during which Kestenbaum prepared ARAs, negotiated and prepared franchise-related documents, and filed franchise documents with the state of Michigan," and thus "Kestenbaum was hired to do more than draft ARAs, and certainly more than draft the Second ARA. He was Plaintiff's counsel for any franchise matters that arose." (*Id.*) The Magistrate Judge recommended finding that Kestenbaum ceased providing legal services to Black Rock either in December 2020, when his name no longer appeared on emails to

35

Black Rock, or in February 2021, when Spadea attorney Matson told Black Rock's representatives that Kestenbaum would no longer be working on Black Rock's matters. The Magistrate Judge recommended that either way, this July 2021 lawsuit is timely filed. (*Id.* PageID.4632.)

Defendants disagree and argue that Black Rock's allegations pertain solely to the inclusion of evergreen royalties in the Second ARA, not Kestenbaum's subsequent continuing representation as franchise counsel, and thus the "matters of which the malpractice arose" began to accrue upon execution of the Second ARA on June 21, 2017. (ECF No. 73, Defs. Obj., PageID.4658-60.) Defendants assert they subsequently worked on "separate and completely distinct legal transactions" with Black Rock, involving different contracts and with different parties and restaurants located in different states. (*Id.*)

Black Rock argues that Defendants maintained their relationship with Black Rock until at least February 1, 2021. Black Rock paid Defendants a fixed fee every month for legal services related to their franchising regardless of the amount of work performed until May 31, 2021. Black Rock contends that Kestenbaum did in fact perform work for Black Rock related to the Second ARA through December 2020, including preparing a Second Amendment to the Second ARA in December 2019 (less than two years before this suit was filed in July 2021), and that he provided

legal advice to Black Rock about possible termination of the Second ARA through December 2020. (*Id.*)

Upon review of the record evidence, this Court agrees with the Magistrate Judge that, construing the facts in the light most favorable to Black Rock, Black Rock filed its legal malpractice action within the statutory two year limitations period. In enacting Mich. Comp. Laws 600.5838(1), the Michigan legislature adopted the "last treatment" or "continuous professional representation" approach to the accrual of a legal malpractice claim. *See Levy v. Martin*, 463 Mich. 478, 483 (2001). This rule provides that if a plaintiff is injured as a result of professional services, but continues to receive related services, those continuing services "constitute 'the matters out of which the claim for malpractice arose'" for limitations purposes. *Id.* at 488-89. "Where the parties have a longstanding relationship with respect to multiple interrelated matters, the statute of limitations generally have been held to run from the last date of service on all matters." *Ameriwood Indus. Int'l Corp. v. Arthur Anderson & Co.*, 961 F. Supp. 1078, 1093 (W.D. Mich. 1997); *see also Levy*, 463 Mich. at 489 (holding plaintiff's malpractice claim regarding improper preparation of tax returns for 1991 and 1992 did not accrue until at least 1996 when defendant stopped providing professional services because "it is clear that plaintiffs, rather than receiving professional advice for a specific problem, were receiving generalized tax preparation services from defendants"); *Nugent v. Weed*, 183 Mich.

App. 791, 796 (1990) (finding that the attorney who provided ongoing representation, which included advice on a series of investments over a period of time was "not retained to perform any specific legal service" and thus did not discontinue serving the client until the client relieved him of his duties).[3]

The Michigan Court of Appeals' decision in *Maddox v. Burlingame*, 205 Mich. App. 446 (1994) in instructive. In that case, the court concluded that the defendants' acts constituted continuing representation. The defendant attorney consulted with the plaintiffs regarding the sale of a franchised business in September 1986. The sale closed in October 1986. When the purchasers ceased making payments under the purchase agreement in 1987, the defendants revised the sale agreement to accommodate the purchaser's financial problems. After further

---

[3] Defendants' reliance on *Rigoni v. Westrate*, No. 334179, 2017 WL 4700041 (Mich. Ct. App. Oct. 19, 2017) is misplaced. In *Rigoni*, defendants prepared an estate plan for plaintiff, which was signed on March 9, 2001. Almost 10 years later, in response to an inquiry from plaintiff, defendants "summarized the estate plan created in 2001, explained why it might be difficult to alter the plan, and made suggestions for how plaintiff might do so." *Id.* at *1. Plaintiff brought a malpractice suit against defendants first in January 2013, which was dismissed by stipulated order, and then again on January 2, 2015. The court held the suits were untimely because the defendant's 2011 actions were "simply follow-up actions regarding an otherwise-completed legal service, and did not demonstrate an ongoing attorney-client relationship between plaintiff and defendants." *Id.* at *3. Conversely, here, Defendants maintained on ongoing attorney-client relationship with Black Rock through at least December 2020, and Defendants' actions cannot be classified as merely "'ministerial' tasks undertaken by an attorney following otherwise-completed representation. *See Rigoni*, 2017 WL 4700041 at *3.

noncompliance by the purchasers, the defendants sent a letter in March 1988, on behalf of the plaintiffs demanding immediate payment. The purchasers filed for Chapter 13 bankruptcy in June 1988. *Id.* at 447-48.

The plaintiffs learned that there was a problem with their security interest and contacted the defendants on August 15, 1988, alleging that the defendants had committed legal malpractice. As a result of the phone call, the defendant attorney spoke to the plaintiffs' Florida attorney and conducted legal research regarding Florida's Uniform Commercial Code (UCC). Defendants sent plaintiff an invoice for this work in November 1988. On August 14, 1990, the plaintiffs filed their legal malpractice case against the defendants, alleging that the defendants continued to advise the plaintiffs regarding the sale of the franchise, as evidenced by the November 1988 invoice the defendants sent to the plaintiffs for performing legal research regarding Florida's UCC on August 15, 1988. *Id.* at 448. The court held that the defendants' acts, including research of current law concerning the contract the attorney had drafted, drafting a memo to the file, and billing plaintiffs for the recent services rendered, constituted continuing representation following the business sale in 1986. *Id.* at 450-451 (noting the defendants worked on matters concerning the sale of the business once a year or so, and that the plaintiffs regularly turned to the defendants in this matter).

39

Similarly in this case, Defendants' continuing representation of Black Rock with regard to the Second ARA through December 2020, in conjunction with Defendants' continuing representation of Black Rock in related franchise matters through February 2021, renders the July 2021 filing of this case timely. The Court therefore agrees with the Magistrate Judge that this case involves a continuous legal relationship between Black Rock and Defendants until at least December 2020, and that Black Rock therefore timely filed its legal malpractice claim within the statutory limitations period.

Accordingly, Defendants' Objection No. 5 is overruled.

### F. Objection No. 6: Whether Black Rock's Anticipated Future Damages are Speculative[4]

Finally, Defendants object to the Magistrate Judge's recommendation that Black Rock's anticipated future damages are not speculative because reimbursement of royalties paid is easily calculable. Defendants contend that "any number of unpredictable events would terminate Plaintiff's obligations to pay evergreen royalties," such as if the Second ARA fully terminates or if the three restaurants opened by the AR close under any circumstances. (ECF No. 73, Defs. Obj., PageID.4661-63.)

---

[4] The Court notes that Defendants label this as "Objection No. 5."

Black Rock contends that the Magistrate Judge correctly determined that Black Rock's future damages are not speculative. Black Rock argues that Defendants do not challenge the existence of future damages, but only the amount of such damages, which is not a proper subject for summary judgment.

As a general rule, "damages are not permitted which are remote and speculative in nature." *Grantham & Mann, Inc. v. Am. Safety Prod., Inc.*, 831 F.2d 596, 601 (6th Cir. 1987) (quoting *Agricultural Servs. Ass'n v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1072 (6th Cir. 1977)) "This rule serves to preclude recovery, however, only where the fact of damage is uncertain, *i.e.*, where the damage claimed is not the certain result of the wrong, not where the amount of damage alone is uncertain." *Grantham & Mann*, 831 F.2d at 601-02 (other citations omitted); *see also ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 641 (6th Cir. 2020) (stating damages are considered "too speculative only when the existence of damages is uncertain, not when the precise amount is uncertain."). "Once the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." *Grantham & Mann*, 831 F.2d at 601-02 (other citations omitted). In other words, what matters is whether the plaintiff has demonstrated with reasonable certainty that it has suffered damages;

the precise amount of damages is left for a jury to determine. *See Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 837 (6th Cir. 2007).

Here, Black Rock has presented unrebutted expert testimony that Black Rock has paid evergreen royalties totaling $522,649 through April 2, 2023. (ECF No. 64-14, Frazee Expert Report, PageID.4503.) Black Rock contends that it has continued to pay additional evergreen royalties each month since then which now totals in excess of $652,383.46. (ECF No. 64-15, Paid Royalty Chart, PageID.4522-24.) Accordingly, the Magistrate Judge properly found that Black Rock has demonstrated with reasonable certainty the fact of damages as a result of paying evergreen royalties under the Second ARA.

Black Rock has also presented unrebutted excerpt testimony regarding estimated future royalty payments totaling $1,716.449. (ECF 64-14, Frazee Expert Report, PageID.4509-10.) Defendants here are challenging Black Rock's expert's calculations of the amount future evergreen royalty payments, contending that there are many "future, unpredictable events" that could affect the amount of such future royalty payments, including if the Second ARA terminates for some reason or if the three restaurants opened by the AR close under any circumstance. (ECF No. 73, Defs. Obj., PageID.4662.) However, Defendants' challenges are to the amount of any future damages, not the fact of such damages. Such a challenge is insufficient to act as a prohibition on speculative damages. *See ECIMOS, LLC*, 971 F.3d at 641;

42

*Grantham & Mann*, 831 F.2d at 601-02. Further, as Black Rock explains, its expert Frazee has computed the amount of future damages based on a calculation that includes a substantial discount rate to account for a number of risk factors, including possible termination of the ARA, poor future growth, and poor performance of the brand. (ECF No. 64-14, Frazee Expert Report, PageID.4509.)

Accordingly, Defendants' Sixth Objection is overruled.

## IV. CONCLUSION

For the reasons set forth above, the Court:

(1) **ADOPTS** Magistrate Judge Ivy, Jr.'s April 2, 2024 Report and Recommendation (ECF No. 72);

(2) **OVERRULES** Defendants' Objections (ECF No. 73); and

(3) **GRANTS IN PART AND DENIES IN PART** Defendants Harold L. Kestenbaum, P.C. and Harold L. Kestenbaum's Motion for Summary Judgment (ECF No. 62).

Specifically, Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's Negligent Misrepresentation claim in Count II, and that claim is **DISMISSED WITH PREJUDICE**. Defendants' motion for summary judgment is **DENIED** as to Plaintiff's Professional Negligence claim in Count I, and that claim shall continue.

IT IS SO ORDERED.

Dated: July 17, 2024                    s/Sean F. Cox
          `                             Sean F. Cox
                                        U. S. District Judge

I hereby certify that on July 17, 2024, the document above was served on counsel and/or the parties of record via electronic means and/or First Class Mail.

s/Jennifer McCoy
Case Manager